OPINION
On September 3, 1999, Danny K. Scott, Sr., was indicted by a Franklin County grand jury on two counts of felonious assault, felonies of the second degree. The indictment also carried specifications alleging that he brandished and/or used a firearm during commission of the offense. The indictment arose as a result of an altercation on July 7, 1999 involving Mr. Scott, his son, and two other men, Michael Fisher and Richard Wiseman.
A jury trial commenced on March 22, 2000. The jury ultimately returned guilty verdicts as to both charges and specifications. The trial court ordered preparation of a presentence investigation report and continued the case for sentencing.
Pursuant to an entry journalized July 6, 2000, the trial court sentenced Mr. Scott to two concurrent prison terms of four years, plus three additional years for the firearm specification.
Danny K. Scott, Sr., (hereinafter "appellant") has timely appealed, assigning three errors for our consideration:
First Assignment of Error
 The trial court committed reversible error by refusing to instruct the jury on self-defense and defense of another.
 Second Assignment of Error
 Appellant was denied effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution by the failure of trial counsel to request jury instructions on the lesser included offense of aggravated assault.
 Third Assignment of Error
 The judgment of the trial court was contrary to the weight of the evidence.
Because appellant's third assignment of error requires a recitation of the facts adduced at trial, we address it first. Although stated in terms of "manifest weight" only, the body of appellant's argument incorporates issues related to sufficiency of the evidence as well.
Preliminarily, we set forth the well-established standards by which we are bound in reviewing this assignment of error.
"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v.Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. InThompkins, the court explained at length the distinctions between the two standards:
 With respect to sufficiency of the evidence, '"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson
(1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida
(1982), 457 U.S. 31, 45, * * * citing Jackson v. Virginia (1979), 443 U.S. 307 * * *.
When reviewing the sufficiency of the evidence to support a conviction, an appellate court must review the record to determine "whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In Jenks, the Supreme Court set forth the stringent standard of review to be applied in a sufficiency analysis:
 "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
In contrast, as explained in Thompkins, supra, a manifest weight analysis is slightly different:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * *. Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * *. See, also, State v. Martin
(1983), 20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.').
Pursuant to the foregoing standards, we examine the record in a light most favorable to the prosecution to determine if the prosecution sufficiently proved beyond a reasonable doubt each element of the offenses charged, and/or whether the jury "lost its way" in convicting appellant such that a manifest miscarriage of justice occurred.
Turning now to the specifics of appellant's third assignment of error, appellant contends that the prosecution failed to prove by sufficient evidence the elements of felonious assault. As indicated infra, appellant also argues that the verdict was against the manifest weight of the evidence.
Felonious assault is proscribed by R.C. 2903.11, in pertinent part, as follows:
No person shall knowingly:
* * *
 (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *.
Applying the foregoing to the facts of this case, we turn now to the evidence adduced at trial. A review of the transcript reveals varying versions of what allegedly transpired between appellant and several others in a neighborhood dispute.
The prosecution presented four witnesses to testify on behalf of the state: two police officers, one neighbor, and Michael Fisher, one of the two alleged victims.
The state's first witness was Columbus Police Officer Brian Williams, one of the officers who responded to the crime scene. At approximately 9:00 p.m. on July 7, 1999, Officer Williams was dispatched to 873 East Como Avenue in Columbus because of "an individual in the street firing a gun." (Tr. 18.) Upon his arrival, the two alleged victims approached him and provided their version of events, essentially that "they were being shot at." (Tr. 22.) They identified appellant as the shooter and directed the officer to appellant's apartment into which he had fled. Based upon information received from the witnesses, Officer Williams found a handgun in the bed of appellant's pickup truck. Along with the gun, he also recovered three spent shell casings and two live rounds. The officer identified appellant as the suspect he arrested that evening.
On cross-examination, Officer Williams acknowledged that his knowledge of the details of the incident was limited in large part to the accounts given by the two alleged victims.
Defense counsel stipulated that appellant fired that gun that night.
State's witness Sharon Wilson testified regarding her recollection of events. At the time of the shooting, Ms. Wilson was working on a rental home she owned nearby on East Como Avenue, next door to appellant's residence. She gave the following narrative detailing what she witnessed:
 I was at the rear of the house working on some kitchen counters, and I heard what sounded like an argument. So I went to the front of the house, and directly in front of the house there is some apartments at this angle and an apartment directly here. A younger man with no shirt went across the street and they were swearing back and forth, three or four people over here and him. And they got into a roll-around-the-dirt scuffle.
* * *
 Well, they rolled around the parking lot across the street at the apartments.
* * *
 The younger guy got up. Started backing towards his house, which is east of my property, just next door, and three or four people were approaching him and they are swearing and he went on back home.
* * *
Then the older man came out. [Tr. 53-55.]
The record clarifies that the "younger man with no shirt" was appellant's son, Danny Scott, Jr. She identified appellant as the "older man" who had come out of the house immediately after his son went inside. She continued:
 So he [appellant] cut across the corner of my vacant lot and was walking pretty quick and stopped directly in front of my front door and shot a gun in the air.
* * *
 And took a couple more steps towards these people and drew down into three or four people and discharged the gun again. And I went and grabbed my cell phone and stayed in the back of the house until I heard the helicopter. [Tr. 55.]
Ms. Wilson attempted to clarify precisely what the "scuffle" entailed:
 Well, the young man was walking across the street towards the group and they were all swearing at each other. When he got to where they were, they started swinging at each other, like a five year old in a schoolyard and they rolled around in the gravel, and he went and he got up and went back to his house and they are screaming approaching him. So, an argument. [Tr. 58.]
Ms. Wilson estimated that the portion of the fight she witnessed lasted "less than a minute." Within another minute, appellant walked out of his house. Ms. Wilson never saw appellant across the street. (Tr. 58.)
Ms. Wilson reiterated that she heard two gunshots. The first gunshot was "just shot into the air." Appellant then "took like two steps * * *[,] drew down and discharged the weapon towards the three or four men in the street." (Tr. 59-60.) Ms. Wilson testified that it was "possible for there to have been another shot" which she did not hear after she retreated to the back of her home to call the police. (Tr. 64.)
Ms. Wilson testified that she did not see "any of the alleged victims hold a knife" or "any of the victims approach * * * [appellant] and attack him with a knife." (Tr. 64.) In summarizing Ms. Wilson's testimony, the prosecution asked, "From the events that you observed, at any time did you observe the Defendant protecting anybody?" Ms. Wilson responded, "No one was out there when he shot the gun. The young man had went home, so, no." (Tr. 65.)
On cross-examination, Ms. Wilson explained that when the younger man involved in the fight, Danny Scott, Jr., got up and backed away from the others, the young man was angry and "outnumbered." He "got up and the three or four guys were walking towards him still in a group and he was backing away still swearing all of them at each other and he went home." (Tr. 79.) When his father, appellant, immediately came outside from the house, she could tell that he was also angry as he walked toward the group of men with whom his son had just fought. This latter portion of her testimony appears contradictory to the above statement that "[n]o one was out there when he shot the gun."
On cross-examination, Ms. Wilson steadfastly maintained her testimony on direct that appellant fired his gun directly into the group of men across the street.
The state's final witness, Michael Fisher, was the only alleged victim called to testify. At the time of trial, Mr. Fisher was serving a prison sentence for a receiving stolen property conviction.
The prosecution elicited from Mr. Fisher the fact that his criminal record includes other felony convictions and incarcerations for receiving stolen property. He also explained that his education was limited to the eighth grade because he was expelled "from all Columbus schools" because he had so many "fights in school." On cross-examination, Mr. Fisher acknowledged that he had also been previously convicted of falsification.
According to Mr. Fisher, he and Danny Scott, Jr., were friends at the time of the incident. In fact, on the morning of the incident, Fisher went over to borrow a temporary tag from him. Although Danny Scott, Jr., was not home at the time, Fisher took the tag. He put the tag on his father's vehicle and took a trip during the day. Fisher returned it to Danny Scott, Jr., later that day.
Mr. Fisher testified that he then went home and drank beer with his stepfather, Richard Wiseman. While Fisher claimed to have consumed only three beers, he estimated that his stepfather had had "anywhere from a six-pack to a twelve-pack." (Tr. 110-111.) Mr. Fisher eventually went to visit a friend at an apartment in the same unit.
At one point, Fisher's mother told him that her husband, Wiseman, was getting hit. Fisher went outside and observed appellant, Danny Scott, Jr., and a relative of theirs named Ronnie walking away. Mr. Fisher found that his stepfather had been hit in the face, leaving a cut on the left side of his cheek. Over defense objection, Fisher testified that Mr. Wiseman told him that Danny Scott, Jr., was the one who hit him. As a result, Fisher and Wiseman "went across the street asking for a fight." (Tr. 117.)
When Fisher and Wiseman arrived across the street near the Scott residence, an argument ensued among them, appellant and appellant's son. At first, the argument was verbal, limited to profanities and threats like, "I'm going to kick your fucking ass." (Tr. 120.) Mr. Fisher clarified that at first, he was arguing with Danny Scott, Jr., only. According to Fisher, appellant did not say anything to him (Fisher) at that time. When asked if Richard Wiseman was saying anything at the time, Fisher said, "Yes. He was ready to fight Danny Scott, Sr." Fisher admitted that he, too, was "ready to fight." (Tr. 121.) However, according to Mr. Fisher, he and Wiseman then just walked away.
Mr. Fisher testified that he and Mr. Wiseman went across the street. Then, "Danny Scott, Sr., he walks over to the grass area and holds a gun up in the air and fires it." (Tr. 121.) Fisher hid behind a van. Then, according to Fisher, appellant "fired a second round aiming the gun straight at me, like he was trying to kill me." Fisher estimated that appellant's second shot was from a distance of twenty to twenty-five yards. Fisher testified that appellant fired a third shot from approximately the same distance, "* * * dead at me like he was going to hit me right in the chest." (Tr. 124.) According to Fisher, his stepfather was right behind him when appellant fired the two shots in their direction.
Mr. Fisher denied that his stepfather tried to attack appellant with a knife during this incident. Fisher recalled that appellant turned and walked back to his apartment right after the third shot was fired.
Mr. Fisher then added that something happened between the verbal sparring and the shots being fired. He claimed that during the verbal confrontation, appellant "pulled a gun out of the back of his pants and he stuck it to my stomach and he said, say I'm a nigger and I'll * * * kill you." (Tr. 128.) It was then, he explained, that the verbal argument stopped and Fisher and Wiseman turned and walked away.
On cross-examination, Mr. Fisher acknowledged that he did not have express permission from Danny Scott, Jr., to borrow the temporary tag; Fisher simply decided to "borrow" it from his friend.
Defense counsel asked Mr. Fisher where the other alleged victim, his stepfather, was while Fisher was testifying. Fisher responded, "[h]e is at home."
The lone witness called by the defense was appellant's son, Danny Scott, Jr. According to Mr. Scott, Fisher did not have his permission to take the temporary tag from his car; instead, he stole it. In fact, Fisher "ripped the top of * * * [Scott's] sunroof off" to get the tag. (Tr. 163.)
Michael Fisher and Richard Wiseman brought the tag over to Danny Scott, Jr., at approximately 6:00 that evening. At the time, Danny was standing right in front of appellant's house. Immediately, an argument ensued between Scott and Fisher, along with Wiseman.
The argument soon escalated to a brawl. According to Danny Scott, Jr., "* * * a bunch of dudes came across the street, * * * and all of them came out throwing bricks at me and ball bats and stuff like that." While he was on the ground, he heard a gunshot. He then saw his father, appellant, with a gun. Appellant told them to get off of his son, but they would not. Appellant fired a shot at the ground a second time. Then, according to Danny Scott, Jr., "* * * they started walking toward * * * [appellant] and he stepped back and he shot again." (Tr. 170.) The record is unclear as to whether or not Danny Scott, Jr., saw the direction of the final gunshot.
Danny Scott, Jr., testified that he saw Richard Wiseman approach appellant with a knife in his hand. As a result, Scott, Jr., ran up and struck Wiseman. Mr. Wiseman yelled "go get my gun" and then "took off" across the street. (Tr. 171.) According to Danny Scott, Jr., he and appellant went back to their house.
On cross-examination, Danny Scott, Jr., acknowledged that his father was "halfway" drunk at the time of the incident.
Given the state of this record, and the stringent standards of review by which we are bound, we must conclude that appellant's convictions for felonious assault were supported by sufficient evidence, and the convictions were not against the manifest weight of the evidence. While the record does not provide overwhelming evidence, there is legally sufficient evidence upon which a jury could rely in finding appellant guilty. In particular, Ms. Wilson's testimony and the alleged victim's testimony, if deemed credible by the factfinder, together satisfy the respective sufficiency and manifest weight tests. Both witnesses indicated that they saw appellant shoot a firearm in the direction of Fisher and Wiseman. The jury acted within its province in finding that appellant knowingly attempted to cause physical harm to the named victims with a firearm.
The third assignment of error is overruled.
Appellant's remaining assignments of error raise issues related to jury instructions which the trial court did not give to the jury.
Initially, we note the standard by which we are bound in reviewing claimed error with respect to jury instructions. In State v. Neal
(Sept. 1, 1998), Franklin App. No. 97APA12-1676, unreported, this court stated:
 * * * Jury instructions must be tailored to the facts of each case. "Obviously, only those instructions which are applicable to the facts of the case should be given." Avon Lake v. Anderson (1983), 10 Ohio App.3d 297, 299
* * *. It is well-established that there must be sufficient evidence produced at trial before an instruction addressing such evidence is given. See, State v. Perryman (1976), 49 Ohio St.2d 14 * * *. In Renfro v. Black (1990), 52 Ohio St.3d 27, at 30 * * *, [the court stated:]
 "* * * [A] trial court has discretion whether to give a requested jury instruction based on the dispositive issues presented during trial. 'It is the duty of a trial court to submit an essential issue to the jury when there is sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue. * * *' Bostic v. Connor (1988), 37 Ohio St.3d 144, 147 * * *." [Emphasis added.]
In his second assignment of error, appellant argues that he was denied the effective assistance of trial counsel because counsel failed to request a jury instruction on the "lesser-included" offense of aggravated assault.
"Aggravated assault" is defined by R.C. 2903.12(A):
 No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:
* * *
 (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon.
To be precise, aggravated assault is an offense of "inferior degree" to felonious assault. Stated simply, aggravated assault is the same conduct as felonious assault but its nature and penalty are mitigated by provocation.
We agree with appellant that, in retrospect, it might have been advantageous to request a jury instruction on aggravated assault. Given the above test regarding instructions, we believe that the record contains sufficient evidence such that a reasonable jury might find that appellant acted with the requisite provocation.
Notwithstanding this hindsight, appellant acknowledges the heavy burden he bears in demonstrating ineffective assistance of counsel. Pursuant to the well-established test set forth in Strickland v. Washington (1984),466 U.S. 668, and its progeny, appellant must establish both deficient performance and resulting prejudice. In State v. Bradley (1989),42 Ohio St.3d 136, the Supreme Court of Ohio held, at paragraphs two and three of the syllabus:
 2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. * * *
 3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.
An instruction on aggravated assault might have changed the outcome of this trial. However, that observation does not dispose of the issue. Given appellant's self-defense/defense of another theory presented at trial, it would not necessarily amount to ineffective assistance for defense counsel to have strategized an "all or nothing" defense, seeking an outright acquittal instead of a potential compromised verdict. It is well settled that "[f]ailure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel." State v. Griffie (1996), 74 Ohio St.3d 332, citing State v. Clayton (1980), 62 Ohio St.2d 45, certiorari denied (1980), 449 U.S. 879.
The second assignment of error is overruled.
The jury instruction issue raised in appellant's first assignment of error presents the more challenging question. He argues that the trial court committed prejudicial error in refusing to instruct the jury on the affirmative defenses of self-defense and defense of another. The state responds that appellant was not entitled to such instruction because he did not establish his evidentiary burden sufficient to warrant such an instruction. Furthermore, the state contends, appellant's "* * * defense was based upon a denial and contradiction of the evidence offered to prove the crime." (Brief at 3.) The latter assertion, as discussed below, is simply an inaccurate characterization of the record in its entirety.
We initially note an independent observation that there is an apparent conflict in the state's arguments on appeal. We perceive an inconsistency under these circumstances where the state argues concomitantly that the record demonstrates sufficient evidence to prove the elements of felonious assault and that there was insufficient evidence of appellant's conduct to justify a self-defense/defense of another instruction. It strikes us as counterintuitive to argue that the record establishes that appellant knowingly attempted to cause physical harm with a firearm and, simultaneously, that the record demonstrates otherwise for purposes of a jury instruction. That question notwithstanding, we turn now to the arguments raised by the parties relative to self-defense and defense of another.
To establish self defense, the following elements must be shown:
 * * * (1) the [accused] was not at fault in creating the situation giving rise to the affray; (2) the [accused] has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the [accused] must not have violated any duty to retreat or avoid the danger.
State v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus, citing State v. Melchior (1978), 56 Ohio St.2d 15.
To establish "defense of another," similar elements must be shown:
 If a person in good faith and upon reasonable ground believes that a family member is in imminent danger of death or serious bodily harm, such person may use reasonably necessary force to defend the family member to the same extent as the person would be entitled to use force in self-defense. * * * [Citations omitted.]
State v. Williford (1990), 49 Ohio St.3d 247, paragraph one of the syllabus.
In Robbins, supra, the court further stated:
 "The proper standard for determining in a criminal case whether a defendant has successfully raised an affirmative defense under R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue."
Robbins at 80, quoting Melchior, supra, paragraph one of the syllabus.
We conclude that sufficient evidence was presented by the prosecution and the defense such that, if believed, would create a question of fact for the jury. Therefore, appellant was entitled to the requested jury instruction.
Pursuant to R.C. 2901.05, the "burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." Since the jury never received the instruction, we need not consider the latter portion of the statute pertaining to the burden of proof. The burden of proof involves credibility determinations properly within the purview of the factfinder. Instead, we must determine whether appellant satisfied the initial burden of production.
The record reveals the judge's reasoning in rejecting defense counsel's request for the instruction:
 [DEFENSE COUNSEL]: * * * We are requesting a self-defense jury instruction, Your Honor.
 THE COURT: We've discussed it and the Court's view is that the only thing that would make a self-defense instruction appropriate would be the testimony of Danny Scott, Jr., who claimed he was being beaten up by several people and his father came out and fired the gun into the ground; therefore, I would have to assume that the request for self-defense instruction would have to be that he was actually using it in defense of his son, Danny Scott, Jr. and it all come down to the believability of Danny Scott, Jr.
 However, if you believe Danny Scott, Jr., then you also have to believe that he only fired the gun into the ground. And if he only fired the gun into the ground, then there wouldn't be any charge of Felonious Assault.
 I think the only issue for the jury to decide is whether or not the Defendant, Danny Scott, Sr., fired the gun into the ground or at the two alleged victims. And I don't and the only testimony from the defense, the only testimony from the state is that he fired it at the alleged victim. And the only testimony from the defense is that he never fired it at the alleged victims, and he came out to defend Danny Scott, but didn't fire the gun at them. And if that's the case, then it would be a not guilty.
 There is also some testimony that Richard Wiseman, one of the alleged victims, went towards the Defendant with a knife. However, the witness who said that, Danny Scott, Jr., said the shots were fired before that, so that situation wouldn't come into play either.
 Based on that, I would think the self-defense instruction wouldn't be appropriate. I think it is either he fired it in the ground or fired it at the alleged victims. [Tr. 179-180.]
We disagree with the trial court's characterization of the evidence adduced at trial. With the benefit of a trial transcript, a careful review of the testimony presented during both the direct and cross-examination of all the state's witnesses reveals that appellant shot both toward the ground and in the direction of the alleged witnesses. While appellant's lone witness, his son, provided some fairly ambiguous testimony about the third gunshot, a reasonable jury could conclude from his testimony that appellant's third shot was fired at the victims. His testimony certainly does not negate that conclusion. The prosecution concedes as much in its brief. (Brief at 4.) We cannot concur with the prosecution's characterization of the evidence that appellant's defense was a "complete denial" that he committed the alleged acts. The record simply does not support this assertion.
During opening statements, appellant's trial counsel clearly stated the defense theory under which he would proceed during trial, stating that "* * * this is the story of a man who had to make, under a good deal of stress, a decision about how he could best protect the safety of his son." (Tr. at 9.) As set forth infra in detail, defense counsel's theory of the case, as elucidated through his examination of each of the witnesses, permeates the entire trial. Since appellant chose not to testify, we do not have the benefit of appellant's own version of events. However, we will not penalize his invocation of the constitutional right not to testify.
Read in its entirety, the record contains sufficient evidence to at least warrant giving the requested instruction. The jury should have had the option to consider the defense.
The rationale underlying our holding is consistent with the recent case of State v. Moody (Mar. 13, 2001), Franklin App. No. 98AP-1371, unreported, in which this court reversed a murder conviction based upon insufficient jury instructions, including the failure to charge the jury on self-defense. The case arose out of a who-shot-whom scenario involving two victims and two gunmen. The testimony presented complicated, conflicting evidence regarding whether Mr. Moody and/or his brother shot either or both victims. This court stated that a trial court has the "* * * responsibility to give all jury instructions that are relevant and necessary for the jury to weigh the evidence and make findings of fact." Id. at 16. (Emphasis added.) In finding the trial court's jury instructions to be deficient, this court concluded that "* * * the trial court's failure to give such an instruction was prejudicial error as it went to the heart of appellant's defense."Id. at 18. Given the testimony in this case, examined in its entirety, the same rationale applies with equal force here. The jury should have had the opportunity to make its own findings of fact as to self defense and/or defense of another.
The first assignment of error is sustained.
The second and third assignments of error are overruled. Having sustained the first assignment of error, the judgment of the trial court is reversed, and this cause is remanded to the trial court for further proceedings consistent with this opinion.
 __________ TYACK, J.
KENNEDY and DESHLER, JJ., concur.