OPINION
{¶ 1} Defendant-appellant, Mark Russell, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to a jury verdict finding him guilty of one count of murder with a firearm specification.
 {¶ 2} On the afternoon of August 11, 2000, the victim in this case, Kenny Sartin, was found dead at the wheel of an idling car stopped on a quiet residential street in northwest Columbus with a crack pipe in his lap and a bullet hole behind his right ear. A short-barreled .38 revolver lay on the floorboards of the car. Appellant was taken into custody at the scene and never denied that he had spent much of the preceding day socializing with the victim at several motels not far from the crime scene, that he had left as a passenger in the victim's car, and that he had been in the vicinity at the time of the shooting. Appellant was not charged with Sartin's death, however, until 14 months later, after having given conflicting accounts to investigating officers regarding events surrounding the shooting.
 {¶ 3} At trial, the state presented the testimony of Tyrone Woods, an acquaintance of both the victim and appellant who spent time with them in the days preceding the shooting. Woods testified that on the morning of August 11, 2000, he went to visit his uncle in a room at the Suburban Lodge on State Route 161. While he was there, he received a call from his friend Kenny Sartin asking him to go to the Motel 6, also on State Route 161, so that Sartin could buy crack cocaine from Woods. Woods then returned to his uncle's room at the Suburban Lodge to drink and smoke marijuana. Around 2:00 p.m., Woods received another call to return to Kenny's room. While there, he observed appellant and an individual known as "Chello" pull into the Motel 6 parking lot in a gray Honda Accord. After leaving, Woods received yet another phone call from a friend named Yashir staying at the Suburban Lodge. Yashir said that appellant was in a room across the hall being disruptive and would not leave, and asking Woods to come and persuade appellant to leave the area.
 {¶ 4} When Woods arrived, he found appellant, Chello, Yashir, and Sartin, among others, in the room, and they went out to the parking lot. Sartin was preparing to give Woods $50 he owed for crack cocaine when appellant became upset, saying that it was rightfully his money. Woods observed that appellant had a gun hanging out of his pocket, and Woods told him to cover it up so that it would not show. There was more bickering regarding the debt, and Woods decided to leave. At this point, appellant asked Woods to take the gun with him, but Woods refused and left with Chello and Yashir.
 {¶ 5} Woods testified that later that evening, appellant came to his house just before 11:00 p.m. and announced that Kenny Sartin was dead. The two then watched the late news on television and immediately Woods saw footage of the car that he had seen appellant and Sartin driving earlier. As they watched the news story, appellant described leaving the Suburban Lodge with Sartin and an individual known as Casper, and that at some point, the car pulled over and appellant got out, leaving Sartin and Casper in the car. Appellant stated to Woods that he then heard a pop and saw Casper running away. Woods testified that although he had not seen anyone named Casper or fitting his description during the morning or afternoon of August 11, 2000, he was, at the time, inclined to believe the story because appellant and Sartin were generally friendly despite the day's argument over the $50 debt.
 {¶ 6} Woods specifically testified that the gun recovered from the crime scene and presented as evidence in the case resembled the gun he had seen earlier in appellant's possession. He further testified that other persons partying at the motels in question had stated that appellant had been drinking and smoking crack for three days straight, although Woods did not personally observe this. Woods had seen appellant drinking alcohol on the day of the shooting, and knew that appellant possessed crack and felt that he was probably smoking it, although he did not directly observe that.
 {¶ 7} Another acquaintance of appellant and the victim, Marchello Cox, testified for the prosecution. He stated that he was the "Chello" identified in previous testimony. He testified, like Woods, that he saw both appellant and Kenny Sartin on August 11, 2000, at motels on State Route 161. Cox testified that he was taking drugs to the motel to sell to Kenny Sartin, and that appellant was driving him. After selling drugs to Sartin, they went to the Motel 6 and drank in Sartin's room with appellant and Woods. Later he ran with appellant to the Suburban Lodge to deliver more drugs.
 {¶ 8} On the morning of the 11th, Cox gave appellant $20 because appellant said he was tired, and Cox told him to go home and get some rest. Cox stated that he knew appellant was tired because they had been up all night drinking, but that he had not personally observed appellant taking cocaine. On the afternoon of the 11th, Cox returned to the Suburban Lodge and again saw appellant and Sartin there. At this time, Cox saw the handle of appellant's gun sticking out of his pants. Cox also identified the holster submitted as evidence by the state as resembling the one he saw on appellant's person that day. When Cox left the motel parking lot on the afternoon of the 11th, appellant and Kenny Sartin were still in the parking lot, and they appeared to be having a disagreement. Cox stated that he had known Kenny Sartin approximately two years at the time of his death, and that he had never known Sartin to carry a gun.
 {¶ 9} The state presented several eyewitnesses to events surrounding the discovery of the victim's body at the wheel of his car. Michael Magora testified that about 3:15 p.m. on August 11, 2000, he was driving his daughter to a pitching clinic when he noticed a car in the area of Sandalwood Boulevard and Redwood Road. The passenger door was open and an individual, who appeared confused, was walking into the street near the vehicle. Mr. Magora could not see anyone else in the car. Mr. Magora was not asked to make a positive identification of appellant as the person he had seen walking in the vicinity of the vehicle.
 {¶ 10} Nathan Rich testified for the prosecution that he was leaving a group home he managed on Redwood Road in the vicinity of Sandalwood Boulevard when he saw a man attempting to flag down vehicles. The defense stipulated that this man seen by Rich was appellant. Appellant got in front of Rich's vehicle, and when Rich stopped, appellant opened the passenger side door and got into the car. Appellant appeared to Rich to be acting rather erratically and high, as though as on a stimulant. Appellant seemed eager to leave the area, and told Rich that appellant's buddy was "really drunk" and appellant wanted to leave immediately. Rich became concerned for his own safety both because of appellant's behavior and because Rich could see an apparently lifeless person in the driver's seat of the stopped vehicle. Rich told appellant that he could not drive him any further and, instead, returned to his near-by place of work and remained in the car in the driveway for a short while pleading with appellant to leave the vehicle and convincing appellant that he could use the phone in the group home. Appellant appeared to attempt to make two phone calls but was unable to complete them and left on foot. As appellant left, he again pleaded with Rich to give him a ride but Rich again refused.
 {¶ 11} Cheryl Drissen was another prosecution witness describing the scene at the discovery of the victim's body. She was visiting her parents on Sandalwood Boulevard when a woman came to the door and said she had been riding a bike with her children and seen an individual in a car who appeared to be sick. After Ms. Drissen looked in the car, she called 911. At this time, a man, later identified as appellant, came running towards her from a house on the opposite corner and asked her, "did you call 911?" Ms. Drissen noticed that the car was running and asked appellant to turn it off. When he refused to do so, she reached in and turned off the ignition herself. As she did so, she noticed a gun and a brown paper bag on the floor of the passenger side of the vehicle and that the person occupying the driver's seat appeared dead. Appellant seemed to notice her observing the gun, and at this point became very agitated. Appellant said that he had just hitched a ride with some persons, and that when someone began acting weird in the car he had jumped out as the car pulled over. Appellant seemed distressed and was repeating, "oh God, oh God." The police arrived shortly thereafter and handcuffed appellant. Ms. Drissen identified a police crime scene photograph showing the gun and paper bag on the floor of the car as accurately depicting what she had observed.
 {¶ 12} Officer Timothy J. Lewis of the Columbus Division of Police, testified and described his response to the crime scene. At 3:24 p.m. on August 11, 2000, he was on patrol on Sandalwood Boulevard when he was flagged down by bystanders and observed an individual apparently passed out in a car with a gun laying on the passenger side floor of the vehicle. He described the vehicle as a 1992 Honda Accord. He also noticed a glass crack pipe in the individual's lap. When Officer Lewis and his partner opened the door, he noticed that the victim was bleeding from the back of his head and was completely unresponsive. The officers ascertained that the victim was not breathing, and called for an ambulance and more units to secure the scene.
 {¶ 13} Officer Lewis and other officers then detained appellant, whom other bystanders had pointed out. Appellant appeared very nervous and was apparently intoxicated.
 {¶ 14} Officer Janel Mead of the Crime Scene Search Unit, also testified regarding the crime scene. Officer Mead testified regarding the various photographs taken of the crime scene and also identified objects recovered from the vehicle. These included two crack pipes and a .38 caliber revolver containing one spent round and three live rounds.
 {¶ 15} Detective William Gillette testified regarding the homicide investigation. He testified that, on the day of the shooting, he went to the crime scene to begin his investigation, but did not personally interview appellant after appellant was taken into custody at the scene. Another detective conducted the first interview with appellant and, based on the result of that interview in which appellant implicated another person as the shooter, appellant was released. The other individual named by appellant, Robert Heltebrake, whom appellant referred to as "Casper," was eventually detained and interviewed. Without objection, Detective Gillette was allowed to testify that Heltebrake subsequently agreed to take a polygraph examination which he passed successfully, and that this was one reason that police did not further pursue Heltebrake as a suspect.
 {¶ 16} At a subsequent interview with Detective Gillette, appellant described the circumstances of the shooting. He stated that he was seated in Casper's car, and that Casper had left the vehicle to get into the victim's car when the shooting occurred. Because this differed in some details from what Detective Gillette had been told about appellant's first interview, he asked appellant if he would take a polygraph examination. Appellant acquiesced initially, but missed the first polygraph appointment.
 {¶ 17} Appellant subsequently contacted police stating that he had additional information regarding the shooter and would like to meet again with Detective Gillette. Detective Gillette met appellant at a restaurant and appellant indicated that he was no longer willing to take a polygraph exam. He stated that a previously unnamed person by the name of "Mook," later identified as Jesse Lanier, was responsible for the shooting.
 {¶ 18} Yet another interview occurred between Detective Gillette and appellant, this time in the tractor cab of appellant's semi-truck. At this interview, appellant stated that he had stopped hauling drugs for certain persons on his runs as a long-haul trucker, and that these persons had recently shot at him. Appellant did not identify exactly who was responsible. Appellant then stated that he knew who had killed the victim, and that appellant was not responsible.
 {¶ 19} Detective Gillette subsequently interviewed Jesse Lanier, and based on the results of that interview, again interviewed appellant. At this interview, appellant returned to his story that "Casper" was responsible. When told that Heltebrake had been interviewed and passed the polygraph test, appellant asserted that "Casper" must have a twin brother, because he was there at the shooting. The detective also advised appellant that Heltebrake's prints had not been found in the car, only the victim's and appellant's prints. At this time, appellant stated that the victim had stolen an ATM card and was using the card to steal money from the owner's account, and that this had possibly led to the shooting.
 {¶ 20} When Detective Gillette confronted appellant with witness accounts that identified the gun and holster found in the car as those in his possession earlier in the day at the motel, appellant not having the gun on his person that day, stated only that he had had a different weapon on his person the day before. Appellant then indicated that he was once more interested in taking a polygraph test and a time was arranged for him to do so, but appellant once again did not show for his polygraph appointment.
 {¶ 21} At yet another interview in which Detective Gillette was speaking with appellant's live-in girlfriend, appellant arrived in the middle of the interview and offered yet another version of the shooting to Detective Gillette. He indicated this time that Marchello Cox was responsible for the shooting, but that Casper was there as well.
 {¶ 22} At a subsequent interview on September 17, 2002, appellant gave yet another version of the shooting. On this occasion, he stated that he and Sartin had just purchased some crack cocaine in the vicinity of Karl Road and Robinwood Drive, and while Sartin drove to Sandalwood Boulevard with appellant in the car, appellant smoked crack cocaine. Sartin then pulled over the car on Sandalwood Boulevard and appellant handed the crack pipe to him. After the crack pipe returned to appellant and he recommenced smoking, he noticed Sartin playing with a handgun. Sartin pointed the gun at appellant and appellant pushed the barrel away with his hand, whereupon the gun accidentally discharged and killed Sartin.
 {¶ 23} After this lengthy series of interviews with appellant, Detective Gillette was ultimately able to arrange for appellant to take a polygraph test. The results indicated that appellant was not being truthful about his description of events on the day of the shooting.
 {¶ 24} On circumstantial issues, Detective Gillette also testified that subsequent investigation determined that the automobile driven by the victim on the day in question had been reported as stolen. A bullet recovered during the victim's autopsy was a ballistic match for the handgun recovered at the scene.
 {¶ 25} Dr. Patrick Fardal, Chief Forensic Pathologist for the Franklin County Coroner's Office, testified regarding his examination of the victim's body. He described the victim as having no injuries other than a single gunshot wound entering behind the right ear, traversing the brain and coming to rest in the left frontal area, indicating a direction of travel from behind the victim to the left and slightly upwards. The presence of gunpowder residue inside the skull and on the outer brain membrane indicated with a high degree of certainty that the bullet wound occurred from a contact wound, with the gun muzzle pressed against the victim's skin.
 {¶ 26} The victim suffered no other visible conditions contributing to his death. The toxicology results indicated a low level of alcohol, and moderate levels of cocaine and cocaine metabolite, roughly the equivalent of four episodes of usage over a period of four to eight hours.
 {¶ 27} Brian D. Reigle of the Ohio State Highway Patrol, testified regarding administration of the polygraph exam to appellant. Appellant was asked four specific questions regarding the circumstances surrounding the shooting. For each question covering his participation in the shooting, appellant's denials were recorded as deceptive on the polygraph examination.
 {¶ 28} Appellant testified on his own behalf. Appellant stated that he had known the victim since 1981. On the day of the shooting, appellant had been riding with the victim, who had offered to give appellant a ride home but indicated that he first wished to stop and buy some crack cocaine. As they turned onto Sandalwood Boulevard, they encountered a car driven by Robert "Casper" Heltebrake. Appellant got out of the car so that Heltebreak could get in and sell the victim some crack. Heltebreak gave the victim a porcelain pipe and, after the victim smoked some crack, an argument broke out. Appellant heard a shot and saw Heltebrake get out of the car and leave.
 {¶ 29} Appellant then flagged down the various bystanders and attempted to make a call to 911, but could not get the phone to work properly. He ran to another bystander and ask her to dial 911, which she did. This woman then asked appellant to open the door and turn the victim's car engine off, and he refused because he did not wish to disturb the crime scene. Police handcuffed appellant upon arrival and took him to police headquarters where he was interviewed by police. He told them what had happened and volunteered to take a gun powder residue test. He was told that the gun powder residue test was negative and he was released.
 {¶ 30} Appellant further testified that he took the lie detector test after he was arrested 14 months after the crime. He took the test under coercion from his counsel, who also told him that he should abandon his story that Heltebrake was responsible for the shooting, and tell the police that the shooting was accidental. Appellant then retained new counsel and reverted to his original, truthful version of events in which Heltebrake shot Sartin.
 {¶ 31} Appellant's direct testimony at trial was that he had not killed the victim, whom he described as a friend, and had never told anyone that anyone other than Heltebrake was responsible. On cross-examination, the prosecution attempted to impeach appellant with Detective Gillette's accounts of his previous recorded interviews, in which appellant implicated Jesse Lanier and Marchello Cox. Appellant continued to assert that he had never told investigating detectives that anyone other than Heltebrake had committed the shooting. He stated that Detective Gillette was the one who kept bringing up other names in interviews and that appellant had always denied that other persons were involved.
 {¶ 32} Appellant did admit that, at one point, he had told the detective that the shooting was accidental, and that he had written a letter to the victim's mother indicating that the shooting was accidental. He stated that he wrote this letter because of pressure from his then-counsel, who indicated that the accident story would produce a more favorable outcome than continuing to assert that Heltebrake was the shooter.
 {¶ 33} No other significant testimony was presented by the defense. At the close of evidence, the prosecution successfully objected to the defense's attempt to introduce the video and audio tape recordings of appellant's police interviews into evidence.
 {¶ 34} The jury returned a verdict of guilty and appellant was sentenced to a term of 15 years to life, with an additional three years on the firearm specification.
 {¶ 35} Appellant timely appeals and brings the following two assignments of error:
ASSIGNMENT OF ERROR NUMBER ONE
The trial court erred when it refused to allow the tape recorded interviews between the defendant and the detective into evidence when both the detective and the defendant testified and there were major conflicts in their testimony with respect to what was said during these interviews.
ASSIGNMENT OF ERROR NUMBER TWO
There were numerous errors in the introduction of the evidence that prevented the defendant from receiving a fair trial. Most of the errors were not objected to but rise to the level of plain error, either individually or collectively, and the defendant was denied the effective assistance of counsel due to counsel's failure to properly object to these errors.
 {¶ 38} Appellant's first assignment of error asserts that the trial court erred in refusing to allow into evidence the recorded police interviews of appellant. The trial court excluded the tapes as hearsay. The trial court found that, since both appellant and Detective Gillette had testified, their testimony constituted the best evidence of the conversations, and the tapes represented an impermissible effort to use out-of-court statements to bolster appellant's in-court testimony. Counsel for appellant asserted at trial, and asserts again on appeal, that this basis for excluding the tapes evaporated once the state presented the testimony of Detective Gillette, which opened the door for the defense to introduce rebuttal evidence.
 {¶ 39} The videotapes and audiotapes in question have been supplied as part of the record before the court in this appeal. A close review of the contents of these tapes leads us to conclude that we need not reach the correctness of the trial court's evidentiary ruling in excluding the tapes, because our review shows no prejudice can have devolved to appellant therefrom. The tapes are substantially consistent with Detective Gillette's description of their contents and particularly with respect to the audiotapes, any inconsistencies between appellant's account of the interview and Detective Gillette's account are explained by Detective Gillette's explanation and interpretation of the occasional use of nods or hand gestures to communicate by appellant. Admission of the tapes into evidence would have done nothing to either discredit Detective Gillette's testimony or bolster that of appellant, and no prejudicial error could be found on the part of the trial court, if error were found at all. Appellant's first assignment of error is accordingly overruled.
 {¶ 40} Appellant's second assignment of error asserts that he did not receive the effective assistance of trial counsel, and was denied a fair trial because of repeated instances of improper admission or exclusion of evidence by the trial court.
 {¶ 41} Addressing first the trial court's evidentiary rulings, we note that admission of evidence lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. Renfro v. Black (1990),52 Ohio St.3d 27. The term "abuse of discretion" connotes more than a mere error of judgment; it implies a decision that is without any rational basis in law, and clearly wrong. Angelkovski v. BuckeyePotato Chips Co. (1983), 11 Ohio App.3d 159.
 {¶ 42} Moreover, in those instances in which defense counsel failed to object to the state's presentation of evidence now cited as error on appeal, we must review the trial court's rulings under the additionally restrictive scrutiny of the plain error standard. Under Crim.R. 52(B), this court has the power to recognize "[p]lain error or defect involving substantial rights * * * although they were not brought to the attention of the court." However, this rule will only be invoked where it is shown that "but for the error, the outcome of the trial clearly would have been otherwise." State v. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus. "[T]he mere possibility that the jury might have reached a different conclusion is not sufficient to sustain the plain error standard." State v. Carr (Aug. 23, 2001), Franklin App. No. 00AP-1235. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Long, paragraph three of the syllabus.
 {¶ 43} Appellant's argument first addresses Detective Gillette's testimony that Robert Heltebrake had successfully passed a polygraph test, causing him to be cleared as a suspect. This testimony came in without objection. Detective Gillette also testified that Heltebrake denied any involvement with the incident and was elsewhere at the time. Both the alibi reference and the polygraph evidence, appellant asserts, constitute inadmissible and highly prejudicial hearsay evidence when introduced through Detective Gillette's courtroom testimony. Appellant also complains that Detective Gillette was also allowed to testify, without objection, to the content of a summary prepared by another detective who conducted the first interview with appellant on the day of the shooting. Detective Gillette also was asked to repeat statements by witnesses at the scene indicating that they had not seen a red car (which appellant asserted Heltebrake had been driving) anywhere in the area, and that the bystanders had, in fact, seen no one other than appellant at the scene. This also, appellant asserts, constituted impermissible, if unobjected, hearsay.
 {¶ 44} The prosecution generally asserts on appeal that all of the above hearsay was not offered to prove the truth of the matter asserted, but introduced solely to explain and develop the investigating detective's investigatory process and clarify the chronology of a rather lengthy investigation during which other suspects were ruled out and alternative theories discarded. This background information was necessary, the prosecution asserts, to place in context the multiple interviews with appellant and establish the course of inquiry that revealed the inherent inconsistencies of appellant's various accounts of his role in Kenny Sartin's death.
 {¶ 45} Accepting, arguendo, appellant's position that the testimony at issue went beyond mere background or introductory matters and should have been excluded as hearsay, we find upon the application of plain error standard that no plain error can be found. The prosecution's case in this matter rested partially upon circumstantial evidence: the presence of appellant at the scene, the chronology of his interaction with the victim in preceding hours, appellant's possession of a gun similar to that found in the car, and, most tellingly, the location and nature of the contact bullet wound behind the victim's right ear ruling out the kind of self-inflicted accidental wound claimed by appellant at one point in the investigation. The other essential aspect of the prosecution's case rested upon the multiple conflicting accounts given by appellant to investigating officers, with the concomitant effect upon appellant's credibility at trial. Neither of these theories were in any extraordinary measure dependent on exculpation of other specific suspects, but relied more upon the fact that appellant allegedly had inconsistently attributed blame to several other individuals, or had suggested an accident theory inconsistent with the nature and location of the wound. If timely objections and favorable evidentiary rulings had achieved the complete exclusion of any statements tending to clear Heltebrake in the case, it would not, on these facts, appear that the outcome of the matter would necessarily have been much affected. No plain error can be found in the admission of the statements complained of.
 {¶ 46} In addition to the hearsay evidence discussed, appellant also asserts that improper opinion testimony was elicited. This included the detective's opinion that the investigation had succeeded in excluding other known persons as likely suspects. The detective also testified that the physical evidence contradicted appellant's account of the shooting, and that appellant's accounts were not corroborated by anyone else he had interviewed.
 {¶ 47} Generally, the comments focused on by appellant were elicited as background information during questioning, or were relatively peripheral to the substance of Detective Gillette's testimony. The most questionable element of this opinion testimony was the detective's statement that the physical evidence produced in the investigation contradicted appellant's version of the shooting. As appellant points out on appeal, the physical evidence gathered at the scene concerning the location of the body, nature of the gunshot wound inflicted, location of the firearm on the floor of the car, and the number of rounds fired, no more contradicted appellant's version of the shooting than it did the prosecution's. The prosecution also used such testimony to establish that Heltebrake's prints were not found at the scene, either on the gun or in the car, and that Heltebrake had passed a polygraph test. Nonetheless, the impact of such testimony by Detective Gillette, even if taken to be improper on the present facts is, again, difficult to evaluate as generating prejudice rising to the level of plain error. If Heltebrake were excluded on the basis of absence of fingerprints at the scene (having passed a lie detector test), then the absence of gunshot residue on appellant's hands and the absence of fingerprints on the gun would have tended also to convince the jury of appellant's innocence. As with the hearsay testimony, the ambivalent impact of this testimony makes it difficult to assess as prejudicial to the point of constituting plain error.
 {¶ 48} Appellant also asserts that the trial court committed plain error in allowing certain testimony by Brian Riegal, the polygraph examiner, regarding the reliability of the polygraph and thus its probative value. Specifically, the examiner concluded his testimony by opining that, as a result of his analyses of appellant's responses, "[m]y opinion is that he did pull the trigger and that he did kill Kenny Sartin." (Tr. 280.) No objection was lodged as to this statement by the witness which was clearly beyond the scope of permissible testimony by a polygraph expert. However, the trial court did subsequently give the correct instruction regarding the polygraph evidence:
The results of a polygraph examination have been admitted into evidence. The results obtained from the polygraph examination are not admitted to prove or disprove any element of the crime with which the Defendant is charged. Rather, the testimony is admitted to indicate [whether] at the time of the examination, the Defendant was not telling the truth. You may consider the testimony for purposes of testing the credibility of the Defendant.
(Tr. 444.)
 {¶ 48} Similarly, the prosecution in closing argument urged the jury to take the polygraph test results on exactly these terms:
We had some testimony about a polygraph test. And I kind of just want to echo what Detective Gillette said. Because the reason why the polygraph test was submitted to you was because it's a tool, and I want you to use it as a tool. You can use it as a tool to judge the other evidence, to judge what this witness had said, whether or not he's lying. You know, if polygraph tests were, you know, the be all and end all of the truth, we would give everybody a polygraph test and we wouldn't use jurors.
(Tr. 405.)
 {¶ 49} A jury will be presumed to have followed the instructions of law given to it by the trial court. Bell v. Mt.Sinai Med. Ctr. (1994), 95 Ohio App.3d 590, 599. The trial court's instruction on the weight to be given to the polygraph evidence was correct, comprehensive, and clear and, in the present case, can be presumed to have overridden any objectionable or inadmissible statements by the polygraph examiner regarding appellant's guilt, particularly in light of the stress the prosecution itself placed upon the limited purposes of the polygraph evidence. We find no plain error in the polygrapher's conclusory statements.
 {¶ 50} Finally, we turn to appellant's contention that he did not receive effective assistance of trial counsel, which is based largely upon the failure to object to the hearsay or opinion testimony outlined above. In order to establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that his trial counsel's performance was so deficient that it was unreasonable under prevailing professional norms.Strickland v. Washington (1984), 466 U.S. 668, 687-688,104 S.Ct. 2052. The defendant must then establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
* * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."
Id. at 689, citing Michel v. Louisiana (1955), 350 U.S. 91,101, 76 S.Ct. 158.
 {¶ 51} A verdict adverse to a criminal defendant is not necessarily indicative that he received ineffective assistance of counsel. State v. Hester (1976), 45 Ohio St.2d 71, 75.
 {¶ 52} If we aggregate the testimony alleged as erroneously admitted in the present case, we can find, first, no unprofessional error on the part of trial counsel in choosing the course of the defense, and second, no actual prejudice to appellant in failing to object to the specific evidence raised in this appeal. Even accepting that trial counsel's failure to object to the opinion testimony and hearsay testimony could not be justified on tactical grounds, we find that there is no reasonable probability that, but for the failure to object, the results of the proceeding would have been different. We accordingly find that appellant was not denied the effective assistance of trial counsel.
 {¶ 53} Having found neither plain error in the trial court's admission of the disputed testimony, nor ineffective representation by trial counsel in failing to object thereto, appellant's second assignment of error is overruled.
 {¶ 54} In accordance with the foregoing, appellant's first and second assignments of error are overruled, and the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 Petree and Klatt, JJ., concur.
Wright, J., retired, of the Ohio Supreme Court, assigned to active duty under the authority of Section 6(C), Article IV, Ohio Constitution.