OPINION *Page 2 
{¶ 1} Appellants Kelly and Matthew Foss appeal the trial court's ruling allowing the presentation of video of a metal plate being implanted in a cadaver arm as a demonstrative exhibit and the trial court's ruling as to an expert witness opinion in this matter.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On November 28, 2003, Plaintiff-Appellant Kelly Foss was involved in a single-car accident while traveling with her husband in Indiana. The car slid off the road on "black ice." She was taken to a local hospital and diagnosed with a fractured right arm. Instead of seeking treatment for her injury in Indiana, Appellant chose to return to Canton, Ohio, to pursue treatment where she was referred to Defendant-Appellee Dr. Thomas W. Watson, a board certified orthopedic surgeon. (T. Vol. II at p. 80, 87-88).
 {¶ 3} Dr. Watson had never treated Appellant previously. (Id. at 88). On December 3, 2003, Dr. Watson performed a physical examination and diagnosed Appellant with a severe comminuted fracture of her humerus which required surgical repair. (T. at 484). During such examination, Dr. Watson confirmed that Appellant "was able to dorsiflex her wrist" (i.e., lift it upward) and "extend her fingers and lift her thumb." (Id. at 88).
 {¶ 4} Due to the severity of her fracture, as well as its proximity to her radial nerve, Dr. Watson explained to Appellant that surgical repair of her arm posed several risks. (T. at 486-487). Specifically, Appellant was told that during the surgery, there was a chance the radial nerve could be injured. (T. at 486). Dr. Watson also told Appellant that a radial nerve injury could result in the "loss of the ability to dorsiflex the wrist, *Page 3 
extend the fingers, extend the thumb and the sensation in that region." (T. at 486-487). This type of injury could resolve itself in a matter of days, weeks, months, or it could be permanent. Id. After being fully apprised of the risks, Appellant chose to undergo surgery.
 {¶ 5} On December 3, 2003, Dr. Watson performed an open reduction internal fixation repair of Appellant's fracture. (T. at 492). The surgical procedure involved using a metal plate and eight (8) screws to secure Appellant's humerus back into correct anatomical alignment. (T. at 94). Part of the procedure required Dr. Watson to retract and manipulate the radial nerve in order to protect it for the duration of the surgery. (T. at 495).
 {¶ 6} At the start of the procedure, Dr. Watson opted not to use a tourniquet to suspend the blood-flow to the arm. (T. Vol. IV at 512-513). He joined and affixed the bone together with an 8-hole metal plate. (T. Vol. II at 94).
 {¶ 7} During the surgery, Dr. Watson was able to examine the radial nerve and noted in his operative notes that while Appellant's radial nerve was intact, it had suffered bruising. (T. at 513-514). The operative note also made reference to the fact that at the conclusion of her surgery, Appellant's radial nerve was placed over holes three through five from the distal aspect of the plate that was used to repair Appellant's fractured arm. (T. at 511).
 {¶ 8} After Appellant woke from the anesthesia, Dr. Watson conducted a postoperative exam and noted that she was experiencing a wrist drop. (T. at 516). Wrist drop is indicative of a radial nerve injury, and Dr. Watson attributed the injury to the proximal retractor used to retract the radial nerve while securing the hardware in *Page 4 
Appellant's arm. (T. at 518). Appellant's wrist drop did not improve over the following months.
 {¶ 9} After a series of electromyellogram (EMG) tests designed to test nerve function indicated Appellant suffered a severe nerve injury, she sought treatment from a neurologist named Nicholas Boulis, M.D. Dr. Boulis recommended surgical intervention and on September 10, 2004, performed a radial nerve exploration and radial nerve grafting surgery on Appellant in an attempt to repair her injury.
 {¶ 10} During surgery, Dr. Boulis noted that Appellant's radial nerve appeared to be entrapped under the metal plate installed by Dr. Watson. (Boulis Depo. at 18). However, Dr. Boulis did not dissect the entire length of the nerve between the two exposures to confirm this fact. (Id. at 42-43). Dr. Boulis also used his own personal camera to take pictures of Appellant's radial nerve, but admitted that the pictures did not conclusively prove the nerve was trapped under the plate. (Id. at 47, 59). Dr. Boulis then completed the radial nerve graft. After surgery, Appellant underwent physical therapy and experienced improvement in function, but a complete recovery is unlikely. (Id. at 68-70).
 {¶ 11} Plaintiff-Appellants, Kelly and Matthew Foss, commenced this medical malpractice action in the Stark County Court of Common Pleas on November 29, 2004. Case No. 2004-CV-04016. They maintained that Plaintiff-Appellant, Kelly J. Foss, had sustained significant and permanent damage to her right arm and wrist following a surgical procedure that was performed by Defendant-Appellee, Thomas W. Watson, M.D. Dr. Watson's professional practice, Omni Orthopedics, was also included as a defendant in the action. *Page 5 
 {¶ 12} Defendants served their Answers on December 27, 2004 denying liability. The parties thereafter proceeded with discovery.
 {¶ 13} A jury trial commenced before Judge Sara E. Lioi on June 12, 2006.
 {¶ 14} At trial, Plaintiffs-Appellants introduced photographs and plastic models as demonstrative exhibits.
 {¶ 15} Defendants-Appellees, in addition to introducing other exhibits including photographs, a plastic model of the arm and radial nerve and the drill used in this procedure, played for the jury a nine minute video of a surgical procedure on a cadaver arm which showed the humerus, the radial nerve, the tissue surrounding the radial nerve, the metal plate and screws used in this procedure and the location of where such plate would have been placed in relation to same.
 {¶ 16} Plaintiffs-Appellants objected to such video arguing that same was a misleading re-creation of Appellant's surgery.
 {¶ 17} After three (3) days of testimony, the jurors returned a defense verdict on June 15, 2006. (T. Vol. IV at p. 627-628). Judge Lioi entered a judgment accordingly on June 16, 2006.
 {¶ 18} Plaintiff-Appellants commenced this timely appeal on July 13, 2006, assigning the following errors for review:
 ASSIGNMENTS OF ERROR {¶ 19} "I. THE TRIAL JUDGE ABUSED HER DISCRETION, TO PLAINTIFF-APPELLANTS' SUBSTANTIAL PREJUDICE, BY ALLOWING THE DEFENSE TO PLAY A SELF-PROMOTING AND MISLEADING VIDEO TO THE JURY. *Page 6 
 {¶ 20} "II. A SECOND ABUSE OF DISCRETION WAS COMMITTED THAT UNDULY PREJUDICED PLAINTIFF-APPELLANTS WHEN THE TRIAL JUDGE REFUSED TO ALLOW THEIR COUNSEL TO QUESTION THE DEFENSE."
 I. {¶ 21} Appellants in their first assignment of error, argue that the trial abused its discretion allowing the defense to show its video to the jury. We disagree.
 {¶ 22} Appellants argue that the said video was a misleading re-creation of the surgery which is the subject of this lawsuit.
 {¶ 23} Appellees argue that such video was a demonstrative aid used to depict to the jury the anatomy and how the plate is slid underneath the radial nerve, how the drill is used to drill holes in the bone and how the screws are inserted.
 {¶ 24} Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Moreover, the trial court is vested with broad discretion in determining whether relevant evidence should be excluded due to the danger of unfair prejudice, of confusion of the issues, or of misleading the jury under Evid.R. 403(A) and (B). Evidence that is not relevant is inadmissible. It is well established that the admission of relevant evidence rests within the sound discretion of the trial court. An abuse of discretion is more than an error of law; it implies that the court acted unreasonably, arbitrarily, or unconscionably. Absent an abuse of discretion that materially prejudices a party, the trial court's decision must stand. *Page 7 
 {¶ 25} Likewise, the admission of demonstrative evidence is within the sound discretion of the trial court, in light of all the circumstances in the case. Tritt v. Judd's Moving Storage, Inc. (1990),62 Ohio App.3d 206, 218, 574 N.E.2d 1178, 1186-1187. Only when the trial court has abused its discretion in the admission or rejection of such evidence will this Court reverse the trial court's decision. Id.
 {¶ 26} The issue for this Court to determine is whether the use of such video created unfair prejudice and confusion of the issues. See Evid.R. 403(A). More particularly, the issue of whether the relevancy of the demonstration when used to illustrate the anatomy was substantially outweighed by the danger that the jury would mistakenly believe that the video was meant to represent the actual conditions which existed during the actual surgery. Again, we will not disturb the decision of the trial court on this question absent a clear showing of an abuse of discretion. See State v. Allen (1995), 73 Ohio St.3d 626, 653 N.E.2d 675; Renfro v.Black (1990), 52 Ohio St.3d 27, 556 N.E.2d 150.
 {¶ 27} In the case sub judice, the trial court determined that the video in question was a demonstrative exhibit and that "it would be helpful to the fact finders to understand the anatomy just as any other visual exhibit used throughout these proceedings has been helpful." (T. at 476).
 {¶ 28} Upon review of the record, this Court finds that Appellees did not offer the video as a re-creation of the actual surgery. Appellees made repeated statements that this video was being offered as demonstrative evidence only: *Page 8 
 {¶ 29} Atty. Kremer: "I think that I think that covers the surgery. What I would like to do now is, Doctor, use some demonstrative evidence to help the jury better understand the anatomy. Do we have some of that?
 {¶ 30} Dr. Watson: "Yes. One of the things about this with drawings, with models, there's no way you can represent the critical anatomy.
 {¶ 31} "This next thing that we are going to show, this video is demonstrative only in that it shows the critical anatomy. That's all it does. Shows the anatomy. This that we are going to show is a cadaver. A cadaver is somebody who has donated their body to science. In fact, it was basically just from the shoulder blade down. And what we did is we dissected out the critical anatomy to fairly and accurately represent the anatomy of the distal humerus in respect to the humeral bone, the radial nerve and the soft tissue surrounding the area." (T. at 519-520).
 {¶ 32} * * *
 {¶ 33} Dr. Watson: "This just demonstrated the anatomy. Again, the critical thing is the plate is on the lateral aspect of the humerus in that area. * * *" (T. at 524).
 {¶ 34} (Cross Examination)
 {¶ 35} Atty. Madden: "Dr. Watson, with all of the models and all of the blowups, and all of the recreations that you have brought here today, what you have demonstrated for the jury is the ideal surgery, doing the humeral fracture repair surgery on Kelly the way it is supposed to go right; is that right?
 {¶ 36} Dr. Watson: "The models and the discussion there, the video was just demonstrative anatomy. It was to help you understand how that nerve worked. That had nothing to do with her surgery. It was demonstrating the anatomy. But this is exactly *Page 9 
how I left it looking when I left the surgery. The plate was on the lateral aspect and the nerve was coursing along its normal anatomic course as I noted when I proximated the fascia or pulled the fascia apart without any retractor, without anything that could be potentially altering its course.
 {¶ 37} * * *
 {¶ 38} Atty. Madden: "None of the exhibits, blowups or recreations that you have presented to this jury here this morning have any tie to Kelly's surgery, in other words, none of that is from her?
 {¶ 39} Dr. Watson: "That was all demonstrative anatomy. There was no recreation. Those pictures of the fracture with the plate and the blood, muscle damage had nothing to do with Kelly's surgery. That was another incident where I had to do a fracture fixation. (T. at 554-555).
 {¶ 40} * * *
 {¶ 41} Atty. Madden: "Many, many times as you put your presentation on you assured the jury that these recreations fairly and accurately depicted what goes on in the surgery?
 {¶ 42} "Dr. Watson: "I did not say recreation. Recreation was something that the judge told me I could not say, so I used the word demonstrative anatomy.
 {¶ 43} "Atty. Madden: "You assured the jury that what you were showing them was —
 {¶ 44} "Dr. Watson: "Is the demonstrative anatomy and fair and accurate. *Page 10 
 {¶ 45} Atty. Madden: "There is no tourniquet used in Kelly's surgery, right?
 {¶ 46} Dr. Watson: "No.
 {¶ 47} Atty. Madden: "There was nothing to reduce the flow of blood into the surgical site, right?
 {¶ 48} Dr. Watson: "My hemostasis during the repair was one way that I used to reduce some of the bleeding, but you are right, there was still some blood flow into the muscle during her surgery." (T. at 557-558).
 {¶ 49} * * *
 {¶ 50} Atty. Madden: "But the other thing that you are telling the jury is that this surgery that you demonstrated on the cadaver fairly and accurately depicts what you find as you do the surgery, right?
 {¶ 51} Dr. Watson: "The cadaver was just a deception. All it did was to show the anatomy and the relationship (sic) the distal humerus." (T. at 559).
 {¶ 52} Given the limited purpose for which the demonstration was offered, the lack of a substantial similarity between the conditions of the demonstration and the conditions that existed (i.e. blood) during the actual surgery would not require exclusion of the video. Indeed, the transcript reveals that the trial court was satisfied that there was little risk that the jury would mistakenly believe that the video demonstration was meant to represent the actual conditions which existed at the time of the surgery. In short, the record does not clearly show an abuse of discretion by the trial court. Allen and Black, supra. *Page 11 
 {¶ 53} Based on the record before us, we conclude that the demonstrative video evidence offered here was not so inherently misleading to the jury that its admission was an abuse of discretion; therefore, we overrule this assignment of error.
 II. {¶ 54} In their second assignment of error, Appellants argue that the trial court erred and abused its discretion in not allowing Appellants' counsel to question the defense expert as to whether Appellant's expert was qualified. We disagree.
 {¶ 55} At trial, Defendants-Appellees relied upon the expert testimony of Dr. Michael Magoline, a board certified orthopedic surgeon who specializes in the surgical repair of fractured bones. (T. at 371, 455).
 {¶ 56} During Dr. Magoline's discovery deposition, Plaintiffs-Appellants asked Dr. Magoline the following:
 {¶ 57} Q. "Do you have any reason to doubt that Dr. Tomiano is a highly credentialed orthopedic surgeon?"
 {¶ 58} A: "No."
 {¶ 59} Q. "Did you review his CV?"
 {¶ 60} A. "Yes, I think I believe it was reviewed in his deposition."
 {¶ 61} Q: "Fairly impressive?"
 {¶ 62} A: "Yes. I mean, you have to understand, you're talking to somebody that knows that — I can read a lot of credentials . . . I don't think a lot of letters after your name means anything, but I have no reason to believe he is not — it sounds like he's-he's an orthopedic surgeon there would be no reason to believe he's not intensely qualified for what he does. (Deposition of Dr. Michael Magoline at 76). *Page 12 
 {¶ 63} At trial, Plaintiffs-Appellants attempted to elicit from Dr. Magoline his expert assessment as to Plaintiffs-Appellants' own expert, Dr. Tomiano's qualifications to perform a peripheral nerve repair surgery.
 {¶ 64} Q. "You would agree that Dr. Tomiano is intensely qualified in this are of surgery?"
 {¶ 65} Mr. Kremer: "Objection." (T. at 455).
 {¶ 66} Dr. Magoline had testified, on cross-examination, that he did not perform radial nerve explorations, nor did he perform radial nerve grafting procedures. (T. at 454-455).
 {¶ 67} The trial court ruled that because Dr. Magoline was not the same kind of doctor as Dr. Tomiano, he was not qualified to offer an expert opinion as to Dr. Tomiano's qualifications. (T. at 455-456).
 {¶ 68} Evid.R. 702 provides in relevant part:
 {¶ 69} "A witness may testify as an expert if all of the following apply:
 {¶ 70} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 71} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 72} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *"
 {¶ 73} There is no disagreement in this case that Dr. Magoline possessed the necessary qualifications to testify as an orthopedic surgeon. Indeed, Dr. Magoline was *Page 13 
permitted to offer his expert opinion that Dr. Boulis' opinion that Appellant's radial nerve appeared trapped under surgical hardware was incorrect because Dr. Boulis was mistaken as to the location of the placement of the surgical plate in this case. The trial court refused, however, to allow Dr. Magoline to give his opinion as to the qualifications of Dr. Tomiano.
 {¶ 74} A witness may be qualified to testify as an expert on one subject but may not be qualified to testify as an expert on another related subject. See, e.g., Vistein v. Keeney (1990), 71 Ohio App.3d 92,99, 593 N.E.2d 52, 56-57. (A registered engineer who specialized in determining the cause of defects in buildings and other structures was not qualified to give an expert opinion as to the cause of a bridge collapse, since he was not familiar with the procedures for designing or constructing bridges); Scott v. Yates (1994), 71 Ohio St.3d 219,643 N.E.2d 105 (Although a police deputy was qualified to testify as an expert in accident investigation and offer an expert opinion on the point of impact, he was not qualified to offer an expert opinion on the cause of an accident due to his admitted lack of experience and training in accident reconstruction). The determination whether a witness possesses the necessary knowledge, skill, experience, or training to testify as an expert in a given subject matter is left to the discretion of the trial court. Yates supra.,
 {¶ 75} Given Dr. Magoline's admitted lack of training in radial nerve repair, we are not convinced that the trial court acted unreasonably, arbitrarily, or unconscionably in determining that Dr. Magoline was not qualified to offer his opinion as to Dr. Tomiano's qualifications. *Page 14 
 {¶ 76} Appellants' second assignment of error is overruled.
 {¶ 77} For the foregoing reasons, the judgment of the Court of Common Pleas of Stark County, Ohio, is affirmed.
By: Wise, J., Gwin, P. J., concurs.
 Delaney, J., concurs separately. *Page 15