RENFRO ET AL., APPELLANTS, *v.*
BLACK; SMITH LABORATORIES, INC., APPELLEE.

[Cite as Renfro *v.* Black (1990), 52 Ohio St. 3d 27.]

(No. 89-196 — Submitted February 20, 1990 — Decided June 13, 1990.)

*Murray & Murray Co., L.P.A.,* and *Michael T. Murray,* for appellants.
*Robison, Curphey & O'Connell, James E. Brazeau, Wildman, Harrold, Allen & Dixon, James P. Dorr* and *Steven E. Danekas,* for appellee.

MOYER, C.J. Plaintiffs-appellants' first and third propositions of law are interrelated and will be considered together.

## I

Plaintiffs argue that the trial court should have permitted the jury to consider the "timeliness" of a so-called "Dear Doctor" letter dated "November, 1983" that Smith Laboratories sent to Dr. Dwight, and that the trial court should have instructed the jury

as plaintiffs requested in proposed instruction No. Four.[2]

Dr. Dwight testified that he periodically received correspondence from Smith Laboratories regarding the drug Chymodiactin. Prior to injecting Yvonne Renfro with Chymodiactin, Dr. Dwight received a November 1983 "Dear Doctor" letter from Smith Laboratories.

Among other information, the four-page letter reported that ten patients had suffered "CNS disturbances" of varying degree after chemonucleolysis, including chills, hypertension, shifting levels of consciousness, paresis or paraplegia, and, in some instances, cerebral hemorrhage. Three deaths were reported as having occurred in the ninety days preceding the November 1983 letter. These deaths were for reasons other than the paraplegia suffered by Mrs. Renfro.[3]

---

[2] This requested instruction states in part:

"* * * The adequacy of such warnings is measured not only by what is stated, but also by the manner in which it is stated. A reasonable warning not only conveys a fair indication of the nature of the dangers involved, but also warns with the degree of intensity demanded by the nature of the risk. A warning may be found to be unreasonable in that it was unduly delayed, reluctant in tone or lacking in a sense of urgency. You may find that the warning in question was inadequate and unreasonable even where the existence of a 'risk' that is a causal relationship between the use of the product and the resulting injury has not been definitely established. * * *"

[3] "Dear Doctor:

"You have been identified as being among the surgeons interested in or performing chemonucleolysis. This correspondence is provided to give you current observations concerning the clinical experience with Chymodiactin[R] (chymopapain) since the drug became commercially available in November 1982.

"The enzyme has been documented, by means of post-marketing surveillance reports returned to Smith Laboratories, to have been administered in well over 20,000 patients. The success rates reported informally to Smith Laboratories by your colleagues is [sic] consistent with that seen in the controlled clinical trial. Important elements which have surfaced repeatedly are that success depends on PROPER PATIENT SELECTION and APPROPRIATE TECHNIQUE.

"With the introduction of a new drug, which is in turn coupled with the introduction of a new procedure, certain events occur [sic] which did not appear in the clinical trials. The following cases are brought to your attention:

"1. Ten patients have been reported to develop a syndrome during the post-chemonucleolysis period which commences approximately 12 hours post-injection and is associated with apparent CNS disturbances of varying severity. These include chills, hypertension, shifting levels of consciousness, paresis or paraplegia, and, in some instances, cerebral hemorrhage. Not all signs and symptoms are present in every patient. These events may be secondary to the entry of chymopapain and contrast material, usually Conray[R], into the subarachnoid space. In one of these patients, contrast material (Renografin[R]) has been documented in the subarachnoid space by x-ray and chymopapain is presumed to have been present. According to the manufacturer, Renografin is known to be extremely toxic when administered intrathecally and requires immediate spinal cord lavage with normal saline. Paraplegia and other neurologic sequelae have been reported. Likewise, Conray has been associated with convulsions, subarachnoid hemorrhage, and death following myelography. (A.K. Bagehi Surg. Neurol. 5 285-286, 1976.)

"The means of entry of chymopapain and contrast agent into the subarachnoid space is not clear, but is presumed to be poor needle placement, resulting in compromise of the dura.

The essence of plaintiffs' argument with regard to the "Dear Doctor" letter is that Smith Laboratories was negligent in not sending the letter in sufficient time to warn physicians who might perform a chemonucleolysis procedure. Plaintiffs' requested instruction No. Four would direct the jury that a warning may be found to be unreasonable if it was unduly delayed, reluctant in tone or lacking in a sense of urgency. The trial court refused to submit the question of timeliness of the November letter because delay had not been established as a proximate cause of Mrs. Renfro's injury.

As plaintiffs indicate, in *Seley* v. *G.D. Searle & Co.* (1981), 67 Ohio St. 2d 192, 198, 21 O.O. 3d 121, 124, 423 N.E. 2d 831, 837, we stated that "[a] warning may be found to be unreasonable in that it was unduly delayed, reluctant in tone or lacking in a sense of urgency." However, a trial court has discretion whether to give a requested jury instruction based on the dispositive issues presented during trial. " 'It is the duty of a trial court to submit an essential issue to the jury when there *is* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue. * * *' " *Bostic* v. *Connor* (1988), 37 Ohio St. 3d 144, 147, 524 N.E. 2d 881, 884. A review of the record indicates that the emphasis at trial was the content or substance of the warning in the correspondence sent by Smith Laboratories to Dr. Dwight and other physicians.

Dr. Dwight testified that he had attended a seminar in Chicago in which he learned that if either the Chymodiactin or the dye got into the intrathecal space the result could be paralysis or subarachnoid transverse myelitis. Additionally, Dr. Dwight knew from the DPI that the drug was extremely toxic when injected intrathecally in animals, and therefore great caution must be exercised in assuring that Chymodiactin is not injected intrathecally. He testified to a full understanding of these dangers before he performed the procedure on Mrs. Renfro.

Dr. Dwight testified that he received and read the November 1983 letter before performing the chemonucleolysis on Renfro. Nevertheless, Dr. Dwight felt that the warning contained

---

"The mechanism of this toxicity may be secondary to the administration of Conray, or may be secondary to the bleeding that can occur when chymopapain comes in contact with capillaries of the pia-arachnoid. Bleeding into the subarachnoid space has been documented to worsen the toxicity secondary to radiocontrast materials in the subarachnoid space.

"Present labeling provided with each vial of Chymodiactin[R] states, 'The drug is extremely toxic when injected intrathecally in animals. Therefore, great caution must be exercised in assuring that Chymodiactin[R] is not injected intrathecally into the dural canal'. The toxicity secondary to radiocontrast materials has been well documented, and Conray, in particular, has been shown to cause a high incidence of arachnoiditis. (The review by Esses and Morley 'Spinal Arachnoiditis' in the *Canadian Journal of Neurological Sciences*, 1983; *10*:2-10 is a useful reference.)

"The above observations do not substantially alter the initial impression of the utility of chemonucleolysis, particularly when compared to laminectomy. However, they do emphasize the importance of proper patient selection. They also tend to strengthen the concept that discography provides the only means of definitively confirming proper needle placement and visually determining the most likely distribution of the enzyme. A discogram which reveals placement of the needle in, or a connection to, the subarachnoid space should result in discontinuation of the procedure. * * *"

in the November "Dear Doctor" letter was insufficient to warn of paraplegia as a possible side effect. Clearly, the issue for the fact finder was to determine whether the substance of the letter constituted adequate warning in light of the three new cases of paraplegia reported to Smith Laboratories in August and October 1983.

In view of the evidence before the court, we find no error in the trial court's refusal to permit the issue of timeliness of the "Dear Doctor" letter to be placed before the jury. The issue of whether testimony or evidence is relevant or irrelevant, confusing or misleading, is best decided by the trial judge, who is in a significantly better position to analyze the impact of the evidence on the jury. *Columbus* v. *Taylor* (1988), 39 Ohio St. 3d 162, 164, 529 N.E. 2d 1382, 1385; *Calderon* v. *Sharkey* (1982), 70 Ohio St. 2d 218, 24 O.O. 3d 322, 436 N.E. 2d 1008. The first and third propositions of law are overruled.

II

In their second proposition of law, plaintiffs argue that the trial court erred in ruling that "the only evidence of other adverse reactions to Chymodiactin which are relevant are those related to adverse reactions which are substantially similar to the alleged reaction in this cause of action."

The law in the area of admissibility of "prior accidents" or occurrence evidence was succinctly stated in *McKinnon* v. *Skil Corp.* (C.A.1, 1981), 638 F. 2d 270. There, the court considered admissibility of prior accident evidence in a products liability action concerning an allegedly defective Skil saw. The plaintiff attempted to introduce answers to interrogatories

regarding prior personal injury accidents involving the Skil saw. The answers did not indicate how the injuries occurred or whether they resulted from defective lower blade guards. Plaintiff contended that the interrogatory answers were admissible on Skil's knowledge of prior accidents relevant to the duty to warn, to establish evidence of the existence of defect, causation, and negligent design, and to attack the credibility of the defendant's expert witness. The court held that "[e]vidence of prior accidents is admissible on the first four issues only if the proponent of the evidence shows that the accidents occurred under circumstances substantially similar to those at issue in the case at bar. * * *" (Citations omitted.) *Id.* at 277. See *Hale* v. *Firestone Tire & Rubber Co.* (C.A.8, 1985), 756 F. 2d 1322, 1332; *P.B. Mutrie Motor Transp., Inc.* v. *Interchemical Corp.* (C.A.1, 1967), 378 F. 2d 447, 450-451 (substantial identity); *Jaffe* v. *Powell* (1929), 121 Ohio St. 355, 169 N.E. 31, syllabus; *Cottman* v. *Federman Co.* (1942), 71 Ohio App. 89, 93, 25 O.O. 435, 437, 47 N.E. 2d 1009, 1011; *Robitaille* v. *Netoco Community Theatres of North Attleboro, Inc.* (1940), 305 Mass. 265, 25 N.E. 2d 749.

As plaintiffs admit, the trial court properly permitted evidence of three cases of paraplegia that were reported to Smith Laboratories in August and October 1983. During cross-examination of Dr. Eugene J. Nordby, a consultant for Smith Laboratories, plaintiffs sought introduction of other alleged incidents of neurological reaction to Chymodiactin, which presumably are those listed in defendant-appellee's answer to plaintiffs' interrogatory No. 2.⁴ The following exchange occurred:

---

⁴ Quadriplegia; cerebral hemorrhage; four cases of paraparesis; coma; monoparesis; subarachnoid hemorrhage/foot drop and transient hemiparesis; grand mal seizure; monoplegia/monoparesis and sphincter dysfunction; convulsion; hemiparesis/aphasia and cerebral hemorrhage/subarachnoid hemorrhage.

"[Plaintiffs' counsel]: Your Honor, I understand the Court has already ruled that there can be no testimony relating to any adverse neurological reaction which occurred.

"[Court]: Which are not substantially similar.

"[Plaintiffs' counsel]: Which are not substantially similar meaning paraplegia, as I understand the court's ruling?

"[Court]: I don't know anything else that is substantially similar.

"[Plaintiffs' counsel]: Oh yeah.

"[Court]: Name me something.

"[Plaintiffs' counsel]: Paresis.

"[Court]: That's only weakness.

"[Plaintiffs' counsel]: Paresis, permanent paresis may be if it's permanent. That might be substantially similar if it's a wide thing but a foot drop is clearly not substantially similar and it must be permanent and I think substantially similar to this case would be paralysis. That's permanent and that's wide spread. That means at least beyond one limb. * * * I feel it essential to get it into the record at this point in time because I do feel the other cases of adverse neurological reaction are relevant. I don't see where they would have to be exact same types like even paralysis because —

"[Court]: I think the law is substantially clear. I may be 100% wrong. Do you wish to add anything?

"[Defendant's counsel]: My only concern is that * * * [plaintiffs' counsel] is not going to go into those areas?

"[Plaintiffs' counsel]: I'm not going to."

In Stedman's Medical Dictionary, Fifth Unabridged Lawyer's Edition (1982) 1031, "paresis" is defined as "partial or incomplete paralysis," or a disease of the brain known as *"dementia paralytica"*; "paraparesis" is defined as "a slight degree of paralysis, affecting the lower extremities." *Id.* at 1028. It is arguable that the cases of paraparesis listed in the defendant's answer to the interrogatory may have been similar to the event causing Mrs. Renfro's paraplegia. The November "Dear Doctor" letter mentions paresis, but we find no reference in the answer to plaintiffs' interrogatory to "paresis" events. However, the law is clear that in order for such occurrences to have been admissible to show prior knowledge on the part of Smith Laboratories, these incidents must have occurred under circumstances substantially similar to those in Renfro's case. We find no proffer by plaintiffs to show how the four cases of paraparesis or the other cases of neurological reactions were substantially similar to the circumstances leading to Mrs. Renfro's paraplegia so as to render the evidence admissible.

A trial judge has wide discretion when determining the admissibility of such evidence, and will not be disturbed on appeal absent a clear showing of abuse of discretion. *Worsham* v. *A. H. Robins Co.* (C.A.11, 1984), 734 F. 2d 676, 686. On review of the substantial record in this case, we find no abuse of discretion and will not substitute our judgment for that of the trial court on this issue.

### III

In their fourth proposition of law, plaintiffs contend that it was a denial of equal protection of the law to require them as the injured parties to produce evidence of Smith's alleged non-compliance with the Food and Drug Administration ("FDA") labeling requirement through the testimony of a representative of the FDA.

The trial court ruled that "no reference [is] to be made to alleged non-compliance with FDA regulations

by Defendant Smith Laboratories, Inc., without plaintiffs first laying a competent foundation through a representative of the FDA of such non-compliance." Plaintiffs complain that this ruling prevented them from offering evidence of a number of violations relating to labeling, and that while the claimed violations of FDA regulations would not be dispositive of the issues, such evidence would assist the jury in determining adequacy of the warning.

The court of appeals affirmed the trial court's ruling. We observe that there is no private civil cause of action for monetary recovery based upon alleged violations of the Federal Food, Drug and Cosmetic Act, Section 301 *et seq.*, Title 21, U.S. Code; *Griffin* v. *O'Neal, Jones & Feldman, Inc.* (S.D. Ohio 1985), 604 F. Supp. 717, 720.

Plaintiffs cite no cases specifically in support of their argument. Nevertheless, we need not decide whether plaintiffs were prejudiced by the trial court's ruling as to instances of non-compliance with federal regulations. Plaintiffs did not proffer this evidence, and there is nothing in the record to make a determination whether the alleged incidents of non-compliance would have assisted the jury in determining whether the warnings in this case were adequate. Evid. R. 103; *State* v. *Grubb* (1986), 28 Ohio St. 3d 199, 28 OBR 285, 503 N.E. 2d 142. We therefore hold that plaintiffs have waived this error on appeal.

## IV

In their fifth proposition of law, plaintiffs allege the trial court abused its discretion in not allowing evidence of the "extent of the financial interest that an expert has in a defendant corporation when the expert is called as a witness on the [*sic*] behalf of the defense."

In *Calderon* v. *Sharkey* (1982), 70 Ohio St. 2d 218, 24 O.O. 3d 322, 436 N.E. 2d 1008, syllabus, we stated that "[t]he scope of cross-examination of a medical expert on the questions of the expert's bias and pecuniary interest and the admissibility of evidence relating thereto are matters that rest in the sound discretion of the trial court." The standard of review on such evidentiary rulings is whether the trial court abused its discretion in limiting the cross-examination, and the reviewing court will not reverse the ruling unless the trial court's attitude is unreasonable, arbitrary or unconscionable. *Id.* at 219-220, 24 O.O. 3d at 323, 436 N.E. 2d at 1010; *O'Brien* v. *Angley* (1980), 63 Ohio St. 2d 159, 17 O.O. 3d 98, 407 N.E. 2d 490.

During trial, plaintiffs' counsel asked Dr. Eugene Nordby about his financial interests in both the present litigation and any interests he had in Smith Laboratories. The following exchange occurred during cross-examination:

"Q [Plaintiffs' counsel]: You owned stock in Smith Laboratories in January of 1983, didn't you?

"A [Dr. Nordby]: Yes.

"Q: That would be 20,000 shares?

"A: Yes.

"Q: And the value of that stock was directly related to how well the company did, was it not?

"A: I can't ever figure out how the value is figured because it goes up and down for no apparent reason all the time.

"Q: During the time of January of 1983 you and the other stockholders of the company knew that the more enzymes sold the better the company did, did you not?

"A: I presume that would be basic, yes.

"Q: In order to sell the enzyme you had to convince physicians that they could do the procedure and that it was

safe or as safe or safer than a laminectomy, did you not?

"A: I'm not certain what was their driving force. I personally never tried to sell anyone on it but I tried to educate them as to the benefit and the deficiencies of the enzymes."

Thereafter, the focus of the questions changed, until plaintiffs' counsel again raised Dr. Nordby's pecuniary interest:

"Q: Doctor, you have testified that you're receiving $150.00 an hour for testimony.

"A: No, I didn't say that.

"Q: I'm sorry. I thought it was [sic] you said $1,500.00 a day. Fifteen hundred dollars a day for trial and reviewing materials $150.00 an hour. ***

"A: Right.

"Q: Actually, you have a great deal more to gain, let me rephrase that. Would you agree that you have a great deal potentially to gain if the defense receives a favorable verdict?

"A: I have no interest in the verdict as far as any charges are concerned.

"Q: I'm not suggesting that Doctor, but the fact is that you have a great deal personally to gain, do you not?

"[Defense Counsel]: Your Honor, this is argumentative and there better be a good faith basis—

"The Court: Wait. What I want you to do is ask him what you think he has to gain * * *.

"Q: Doctor, in July of 1983, the value of your 20,000 shares of stock was $27.00 a share."

Defendant's counsel objected to this line of questioning, alleging the purpose was to show that the price of the stock decreased after July 1983, inferring sales decreased, thereby making another inference that doctors no longer perform the procedure as frequently as they used to. Plaintiffs'

counsel asserted that the sole purpose was to show the witness's interest in defendant company. The trial court permitted plaintiffs' counsel to proffer the evidence:

"[Plaintiffs' counsel]: I expect the evidence will be that in July of 1983 as is shown by the records of the company that the value of the stock was $23.00 or $27.25. That is as of the date that I took the Doctor's deposition which was within this past year, the value of the stock was $3.00 a share now. I expect that the testimony, well, I think that we can establish that if the defense gets a verdict that will have a very favorable effect on the value of the stock. That's true.

"THE COURT: * * * First of all, the fact that there's insurance means that there * * * would not be a direct correlation anyway. * * * [P]articularly if there's another drug now on the marketplace, who knows if it's the result of a verdict or * * * competition, * * * or because they now found it is not effective. I think the probative value and the prejudice far outweigh the probative value of that evidence and we'll not go into that. As to the credibility of the Doctor based upon his interest you may inquire of his $20,000.00 [shares]. * * * He's already talked about the amount of money he has received in the past seven years plus the amount of money that he gains from the defendant. * * *"

The trial court had previously ruled on a motion *in limine* that plaintiffs could not introduce evidence of events that occurred after Renfro's December 1983 injury. It is apparent to us that plaintiffs' purpose for introducing the proffered testimony was to place before the jury facts and events that transpired after Renfro's accident. We are not persuaded that this evidence is material or relevant to the presentation of plaintiffs'

negligence claims, inadequate warning claim or their strict liability cause of action. See Evid R. 401 and 403(B).

For the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

HOLMES, WRIGHT and RESNICK, JJ., concur.

SWEENEY and DOUGLAS, JJ., dissent.

H. BROWN, J., dissents with opinion.

H. BROWN, J., dissenting. I believe that the majority has properly analyzed those propositions of law contained in Sections I and IV of its opinion. However, I think the trial judge committed error in restricting the plaintiffs' proof with respect to those matters discussed in Sections II and III. I do not so much fault the legal pronouncements made by the majority, as I do the majority's willingness (on this record) to disregard errors by invoking the doctrines of "judicial discretion" and "waiver."