[Cite as *Neugebauer v. Farinacci*, 2024-Ohio-960.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

SETH NEUGEBAUER, INDIVIDUALLY :
& AS ADMINISTRATOR OF THE
ESTATE OF L.N., DECEASED, ET AL., :

   Plaintiffs-Appellants,    :     No. 112294

   v.            :

JOHN FARINACCI, D.O., ET AL.,    :

   Defendants-Appellees.    :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 14, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-898672

---

### *Appearances:*

Flowers & Grube and Paul W. Flowers; Becker Law Firm, Michael F. Becker, David E. Oeschger, and Holly M. Moore, *for appellants*.

Roetzel & Andress, LPA, Anna Moore Carulas, Tammi J. Lees, Stephen W. Funk, and Emily K. Anglewicz, *for appellees*.

KATHLEEN ANN KEOUGH, A.J.:

{¶ 1} Plaintiffs-appellants, Seth Neugebauer, Individually and as Administrator of the Estate of L.N., deceased, and Samantha Neugebauer ("the Neugebauers" or "appellants") appeal the trial court's evidentiary rulings regarding the scope of cross-examination of defendant-appellee, John Farinacci, D.O., ("Dr. Farinacci") and whether the peer review privilege was properly established. For the reasons that follow, this court affirms the trial court's decisions.

## I.    Procedural Background

{¶ 2} In 2018, the Neugebauers filed a medical negligence lawsuit against Dr. Farinacci and his employer at the time, defendant-appellee, South Suburban Women's Center Inc. (collectively "appellees"), alleging that Dr. Farinacci committed medical negligence in the delivery of their child, L.N., who passed away shortly after birth.[1]

{¶ 3} In 2019, Dr. Farinacci appeared for deposition. Relevant to this appeal, Dr. Farinacci testified that he currently had privileges at two hospitals — Hillcrest Hospital and University Hospitals Parma Medical Center. He testified further about his current medical practice, stating that he currently designated a majority of his practice toward gynecology and gynecological surgery, with

---

[1] The lawsuit also named Cleveland Clinic Health System-East Region, d.b.a. Hillcrest Hospital. In October 2018, all claims against Hillcrest Hospital were dismissed with prejudice following a settlement.

obstetrics limited to in-office care.  Dr. Farinacci stated that as of January 2018, he no longer delivered babies.  He explained:

> At the age of 65, it's — I thought it was time for me to step away from getting up in the middle of the night, and my partners were happy to pick up, you know, that particular additional burden, if you will.

(Dr. Farinacci deposition, tr. 10.)

{¶ 4} Appellants' counsel asked Dr. Farinacci whether he ever had his privileges at any hospital suspended or revoked.  Defense counsel objected, asserting that "we are not going to get into any issue of peer review or anything that is a privileged investigation.  So as to — I will allow him to answer the question of whether his privileges have ever been terminated." (*Id.* at 10.)  Dr. Farinacci responded that "[n]o, my privileges have never been terminated, and my licenses have always been in good standing." (*Id.* at 11.)

{¶ 5} Appellants' counsel clarified, stating that the question was "Have your privileges ever been suspended or revoked?"  Dr. Farinacci's counsel stated that she was "going to instruct him not to answer anything that would involve a peer review process, period." (*Id.* at 11.)  Nevertheless, appellants' counsel asked Dr. Farinacci the follow questions:

> Doctor, as a result of the delivery of [L.N.], were your delivery privileges suspended or revoked?
>
> * * *
>
> Doctor, did [L.N.'s] delivery have anything to do with when you stopped delivering babies in the hospital?

(*Id.* at 11-12.) Each question was met with an instruction to Dr. Farinacci "not to answer" by his counsel, explaining, "We are not going to get into any privileged peer review process, investigation, et cetera. * * * It calls in question potentially a peer review process. It's after the fact; it's irrelevant." (*Id.*)

{¶ 6} At the end of the deposition, appellants' counsel again broached Dr. Farinacci's decision to stop delivering babies. Dr. Farinacci's counsel again warned, "I want to caution you that we're not going to get into anything that involves any type of an M & M peer review that's privileged by Ohio law, okay?" (Tr. 95-96.) Dr. Farinacci responded:

> It was just a personal decision that I made. I knew I was going to retire
> — you know, I had no firm date, and discussed with my partners, and
> it seemed like a good time to go ahead and not do any more deliveries
> and just continue to do, you know, the nine months of care in the office,
> and they were fine with that.

(*Id.* at 97.) Dr. Farinacci responded "correct" when appellants' counsel asked, "And that was your only reason?" (*Id.*) At the close of deposition, appellants asked Dr. Farinacci if he "had to do it over again on this particular labor and delivery, would [he] change anything in [his] management?" (*Id.* at 97-98.) Counsel objected and instructed him not to answer. Dr. Farinacci was then asked:

Q. Doctor, do you think you managed your care appropriately?

A: Oh, absolutely.

(*Id.* at 98.)

{¶ 7} Following Dr. Farinacci's 2019 deposition, appellants did not file a motion to compel or seek a court order directing Dr. Farinacci to answer questions

regarding the status of his hospital privileges that appellees asserted were confidential pursuant to Ohio's peer review privilege.

{¶ 8} Two years later on September 20, 2021, appellees filed a motion in limine seeking to preclude appellants from inquiring at trial about events that took place after L.N.'s delivery, including "alleged quality assurance and peer review investigations, alleged subsequent remedial measures, and any alleged affect [sic] on liability insurance." Appellees contended that the basis for the motion was because of questions asked of Dr. Farinacci during discovery. According to appellees, the questions asked invaded "privileged matters, including Quality Assurance/Peer Review Investigations; Hospital Credentialing; Subsequent Remedial Measures; and subsequent difficulty obtaining liability insurance." According to appellees, this information was covered by an "impenetrable wall of secrecy around all peer review documents, participants, and proceedings," and even "whether a peer review proceeding took place or did not take place * * * is not admissible evidence." In support, appellees relied on R.C. 2305.252, Evid.R. 407 (subsequent remedial measures), and Evid.R. 411 (proof of insurance). Further, appellees claimed that evidence of events after L.N.'s labor and delivery was "unequivocally irrelevant" and "unfairly prejudicial."

{¶ 9} Appellants opposed the motion, contending that before appellees could rely on peer review privilege, they bore the burden of demonstrating that a peer review committee existed, that it investigated the incident, and that the status of Dr. Farinacci's privileges were part of the peer review process. They further

contended that appellees were incorrect in their assertion that the "wall of secrecy" was "impenetrable" because R.C. 2305.252(A) permits the discovery of peer review information if the information is "otherwise available from original sources" and is obtained from that original source. Appellants stated that Dr. Farinacci was an original source and thus the information was discoverable and admissible. Appellants argued further that appellees' reliance on Evid.R. 407 was misplaced because revocation of privileges allegedly occurred by Hillcrest Hospital, a third party, and thus the rule did not apply. Finally, appellants maintained that any revocation or suspension of Dr. Farinacci's privileges at Hillcrest Hospital was relevant and affected his credibility at trial.

{¶ 10} On November 15, 2022, two weeks before trial, appellants filed a motion in limine requesting the trial court to permit cross-examination questioning of Dr. Farinacci about whether and under what circumstances he had been suspended or prohibited from delivering babies at Hillcrest Hospital. In support, they relied upon Evid.R. 611(B) (scope of cross-examination) and 616(A) (bias) to allow this questioning because, according to appellants, Dr. Farinacci was expected to testify as his own expert at trial — appellees had listed Dr. Farinacci as a potential fact and expert witness. Appellants claimed that any use of peer review privilege was improper, unless and until, appellees satisfied their burden of proof that a peer review committee existed and investigated the matter. And even if this burden were satisfied, appellants maintained that peer review privilege did not protect Dr. Farinacci from testifying about his hospital privileges because peer review spares

only non-subject participants who participated in the review and the information and documentation received in the review.

{¶ 11} Appellees opposed the motion, contending (1) that appellants' request was untimely and should have been pursued through a motion to compel following Dr. Farinacci's deposition; (2) whether Dr. Farinacci's privileges were suspended or revoked was not relevant to the issues of whether Dr. Farinacci rendered reasonable care and whether any alleged negligence was a direct and proximate cause of L.N.'s death; and (3) Dr. Farinacci's hospital privileges and credentials were privileged under R.C. 2305.252 and thus neither discoverable nor admissible.

{¶ 12} On November 29, 2022, two days before trial, the trial court summarily granted appellees' September 2021 motion and denied appellants' November 2022 motion, effectively precluding appellants from questioning Dr. Farinacci at trial about the status of his privileges and credentials at Hillcrest Hospital following L.N.'s death.

## II. The Trial

{¶ 13} The matter proceeded to a jury trial before a visiting judge. During the trial, appellants called Dr. Farinacci on cross-examination. He was asked:

Q. Do you consider yourself an expert in obstetrics?

A. I consider myself an — expert is hard. Yes. I think I'm pretty good at what I do. Yes.

Q. Did you know that defense counsel, your counsel, has identified you as an expert on behalf of yourself? Were you aware of that?

A. Well, okay. I'll accept that.

(Tr. 321.)

**{¶ 14}** Regarding the standard of care, the following exchange occurred:

Q. So I want to just confirm some things early on before we start to get into this for the ladies and gentlemen of the jury, it's your strong belief that you acted within the compliance of the standard of care in 2017 for an obstetrician, true?

A. Yes.

Q: Stated another way, you don't feel you made any errors in the management, either prenatally or intrapartum — that is during labor and delivery — for either [baby or mother], correct? Do you believe that?

A. Could you repeat the question?

Q. Yeah. You didn't — even looking back, hindsight, as counsel says, even looking back, you don't feel you made any mistakes?

* * *

Q. Did you meet the standards in 2017 for a diligent, skillful obstetrician, yes or no?

A. Yes, I did.

Q. And if you had to do it over again, you'd manage it the same way?

A. Well, you know, again, that's the hard part of obstetrics is what I heard said in this courtroom. You know, you're looking prospectively so if you're saying given the same clinical setting and the same clinical findings would I have acted in the same manner, the answer is yes. In retrospect, you know, maybe different, may have been different, but I didn't know that. * * * I don't know what the outcome was in this particular case, I didn't know that at the time, so prospectively I would do the exact same thing.

(Tr. 321-322.)

{¶ 15} A discussion thereafter occurred outside the presence of the jury. Because the visiting judge was not the judge who ruled on the pretrial motions, counsel for the parties explained their respective positions and what the rulings prohibited. During this conversation, appellants contended that because Dr. Farinacci agreed that he was an expert and testified that he met the standard of care, they had the right to impeach him on whether his privileges or credentials had been suspended from Hillcrest Hospital as a result of L.N.'s delivery. Appellants claimed that Dr. Farinacci's answer that he was an expert was new and unexpected testimony and thus permitted them to impeach him. (Tr. 323.)

{¶ 16} Appellees objected, contending that this issue had been extensively briefed and ruled on prior to trial. Appellants countered that they had reason to believe that Dr. Farinacci's privileges were suspended or impacted as a result of L.N.'s delivery but they were prevented from questioning Dr. Farinacci regarding this belief during deposition. They claimed that because Dr. Farinacci now testified that he was an expert who met the standard of care, appellants' counsel believed he had "a duty to [his] client to ferret it out." (Tr. 325.) The trial court denied appellants' request, reasoning that "it would be too prejudicial" because the circumstances surrounding any purported suspension may have been unrelated to L.N.'s delivery. (Tr. at *id.*)

{¶ 17} Following this sidebar, Dr. Farinacci admitted that after L.N.'s delivery, he stopped delivering children at Hillcrest Hospital but delivered a few more children at Parma in the months following. He testified that by January or

February 2018, he stopped delivering babies altogether, but still practiced in-office obstetrics. (Tr. 326-328.) Appellants then thoroughly questioned him about his treatment and care before, during, and after L.N.'s delivery.

{¶ 18} After Dr. Farinacci testified, appellants filed a "Motion to Voir Dire Dr. Farinacci regarding his basis for his assertion of peer review privilege and to re-call Dr. Farinacci on cross-examination." Appellees opposed the motion.

{¶ 19} Prior to the start of the fifth day of trial, the trial court addressed this motion and appellants again asserted their belief that Dr. Farinacci's privileges at Hillcrest Hospital were suspended or revoked as a result of L.N.'s delivery and thus, they wanted the opportunity to recall Dr. Farinacci on cross-examination to ask him this specific question. Appellants argued further that Dr. Farinacci waived any peer review privilege when he testified at deposition that his hospital privileges had "never been terminated." Finally, appellants claimed this questioning was allowable because he testified that he was an expert and did not breach the standard of care. Although the trial court recognized that the "peer review statute * * * is not as sacred as [appellees] want it be," the court denied appellants' request to voir dire and re-call Dr. Farinacci on cross-examination. (Tr. 687-688.)

{¶ 20} The trial court allowed appellants to proffer the questions and anticipated testimony of Dr. Farinacci. Specifically, one proposed question asked Dr. Farinacci if his privileges to deliver babies had ever been suspended, revoked, or limited in any way, and further, "Is the reason your privileges to deliver babies at Hillcrest Hospital were suspended, revoked, or limited in any way due to the care

you rendered during the labor and delivery [of L.N.]" Appellants anticipated that Dr. Farinacci's answers would be "yes" to both questions.

{¶ 21} The trial court subsequently permitted appellants, over objection, to question appellees' expert, Dr. Bob Debbs, about Dr. Farinacci's responses in his deposition about whether he had his privileges terminated or suspended and that he did not provide an answer. (Tr. 900-901.) Dr. Debbs agreed that obstetricians can have their delivery privileges suspended or restricted by a hospital but stated that he did not feel it was relevant to the issue at hand and that it was prejudicial. (Tr. 901-902.)

## III. The Verdict

{¶ 22} After an eight-day trial that included the presentation of five expert witnesses and hundreds of pages of exhibits, the jury returned a unanimous verdict in favor of appellees. Based on their responses to interrogatories, the jury found that appellants did not prove by a preponderance of the evidence that Dr. Farinacci was negligent. Although not required to do so, the jury also found that appellants did not prove to a reasonable degree of medical probability that Dr. Farinacci's negligence directly and proximately caused L.N.'s death.

{¶ 23} Appellants now appeal, raising two assignments of error, which will be addressed out of order.

## IV. The Appeal

### A. Peer Review Privilege

{¶ 24} Two days prior to trial, the trial court ruled on 15 pending motions, including (1) summarily granting Dr. Farinacci's September 2021 motion in limine precluding plaintiffs from making any inquiry at trial as to events that occurred after L.N.'s delivery; and (2) summarily denying the Neugebauers' November 2022 motion in limine regarding questioning Dr. Farinacci about any suspension of hospital privileges. The record does not reveal that a hearing occurred prior to trial to address whether information pertaining to Dr. Farinacci's hospital privileges was relevant, protected by peer review privilege, or unfairly prejudicial.

{¶ 25} During trial, Dr. Farinacci's hospital privileges were addressed on three different occasions — once during Dr. Farinacci's testimony, again following Dr. Farinacci's testimony, and a final time following appellants' unsuccessful mid-trial motion to voir dire and recall Dr. Farinacci. Appellees reiterated their belief that the peer review privilege prevented appellants from asking Dr. Farinacci questions about his hospital privileges following L.N.'s delivery, but also claimed that such information was irrelevant and unfairly prejudicial. Appellants again asserted that appellees' failure to establish that the peer review privilege applied, and that the information was relevant and admissible as impeachment evidence based on Dr. Farinacci's testimony that he was an expert and he met the standard of care.

{¶ 26} The trial court questioned the applicability of the peer review privilege but denied appellants' request, finding that the status of Dr. Farinacci's privileges following L.N.'s delivery was "too prejudicial." (Tr. 325.)

{¶ 27} Appellants assert in their second assignment of error that the trial court erred as a matter of law, and otherwise abused its discretion, in concluding that the defense had established an entitlement to the peer review privilege set forth in R.C. 2305.25, et seq.

{¶ 28} Appellants contend that our standard of review is de novo because it involves statutory interpretation and application. We agree that whether the peer review privilege applies is reviewed de novo, *Hance v. Cleveland Clinic*, 2021-Ohio-1493, 172 N.E.3d 478, ¶ 16 (8th Dist.), but find that the court's subsequent evidentiary rulings are reviewed for an abuse of discretion. *Telecom Acquisition Corp. I v. Lucic Ents.*, 2016-Ohio-1466, 62 N.E.3d 1034, ¶ 47 (8th Dist.), citing *Renfro v. Black*, 52 Ohio St.3d 27, 33, 556 N.E.2d 150 (1990).

### 1. Peer Review Privilege

{¶ 29} The party claiming privilege has the burden of proving that the privilege applies to the requested information. *Waldmann v. Waldmann*, 48 Ohio St.2d 176, 178, 358 N.E.2d 521 (1976). Furthermore, "the statutory peer review privilege 'must be strictly construed against the party seeking to assert it and may be applied only to those circumstances specifically named in the statute.'" *Hance*, 2021-Ohio-1493, 172 N.E.3d 478, at ¶ 17, quoting *Smith v. Cleveland Clinic*, 197 Ohio App.3d 524, 2011-Ohio-6648, 968 N.E.2d 41, ¶ 9 (8th Dist.).

**{¶ 30}** R.C. 2305.252 states in relevant part:

Proceedings and records within the scope of a peer review committee of a health care entity shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care entity or health care provider[.]* * * No individual * * * shall be permitted or required to testify in any civil action as to any evidence or other matters produced or presented during the proceedings of the peer review committee.

**{¶ 31}** In *Smith*, this court explained that the purpose of R.C. 2305.252 is "to protect the integrity of the peer review process" to "improve the quality of healthcare," but the privilege "is not a generalized cloak of secrecy over the entire peer review process." *Id*. at ¶ 11. A party claiming the peer review privilege must, at "a bare minimum," show that a peer review committee existed and that it actually investigated the incident. *Id*. at ¶ 13; *Rinaldi v. City View Nursing & Rehab. Ctr., Inc.*, 8th Dist. Cuyahoga No. 85867, 2005-Ohio-6360, ¶ 20-22 (mere assumption that a peer review committee existed is insufficient).

**{¶ 32}** A thorough review of the record reveals that Dr. Farinacci did not withstand his threshold burden of establishing the existence of a committee that met the statutory definition of "peer review committee" contained in R.C. 2305.25(E). At no time did Dr. Farinacci disclose that a peer review committee existed or reviewed Dr. Farinacci's credentialing or quality of care following L.N.'s delivery. In fact, in their September motion in limine, appellees asserted, without citation to any legal authority, that "Whether a Quality Assurance or Peer Review proceeding took place or did not take place regarding the death of L.N. is not admissible evidence in this case. * * * A Plaintiff is not entitled to know, one way or the other, the existence

or nonexistence of privileged peer review proceedings." (Dr. Farinacci's Sept. 20, 2021 Motion in Limine). Based on the foregoing case law, this statement is untrue. "Ohio courts have been adamant that merely labeling a committee * * * 'peer review' is insufficient to meet the burden of proving that the privilege applies." *Smith*, 197 Ohio App.3d 524, 2011-Ohio-6648, 968 N.E.2d 41, at ¶ 23. Equally true is that merely asserting peer review privilege is insufficient to meet the burden that it applies.

{¶ 33} Accordingly, insofar as the trial court concluded that the peer review committee privilege shielded Dr. Farinacci from answering questions about the status of his privileges at Hillcrest Hospital, that decision was in error because appellees did not satisfy their threshold burden of establishing the existence of a peer review committee.

{¶ 34} Although appellees did not withstand their burden of demonstrating the applicability of the peer review privilege, appellees presented additional grounds (relevancy and unfairly prejudicial) to the trial court, both in their pretrial motion and during trial, to support their position that the court should exclude evidence of certain post-delivery events. Because the trial court summarily ruled on the pretrial motions and the trial judge found that questioning Dr. Farinacci about the status of his hospital privileges following L.N.'s delivery would be "too prejudicial," these other grounds could support affirming the trial court's decision.

{¶ 35} To be relevant and therefore admissible, evidence must have a tendency "to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Even if the evidence is relevant, it must be excluded under Evid.R. 403(A) "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 36} "In reaching a decision involving admissibility under Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect." *State v. Wright*, 8th Dist. Cuyahoga No. 108026, 2019-Ohio-4460, ¶ 50, citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), paragraph seven of the syllabus. Trial courts are afforded broad discretion in balancing the probative value of evidence against the danger of unfair prejudice to the defendant under Evid.R. 403(A). *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 171.

{¶ 37} "'When determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission.'" *Bromall v. Select Specialty Hosp.*, 2022-Ohio-2496, 193 N.E.3d 609, ¶ 55 (8th Dist.), quoting *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 22.

{¶ 38} "Unfair prejudice does 'not mean the damage to a [party's] case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.'" *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 89, quoting *United States v.*

*Bonds*, 12 F.3d 540 (6th Cir.1993). "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001). It is evidence that "'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish'" and generally "'appeals to the jury's emotions rather than intellect.'" *Id.*, quoting *Weissenberger's Ohio Evidence*, Section 403.3, 85-87 (2000).

{¶ 39} Based on the foregoing, we find that the probative value of whether Dr. Farinacci's hospital privileges were suspended or revoked following L.N.'s delivery was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

{¶ 40} "In a medical-malpractice case, evidence that a defendant-doctor's medical license was revoked is by its very nature prejudicial. It predisposes the jury to find that the doctor acted outside acceptable bounds of competence." *Setters v. Durranni*, 2020-Ohio-6859, 164 N.E.3d 1159, ¶ 20 (1st Dist.) However, this does not necessarily equate to unfair prejudice. *Id.* We must examine the context to determine how the evidence would have been used or for what purpose, and whether it was presented to encourage the factfinder to draw an improper inference.

{¶ 41} After the trial court denied appellants the ability to question Dr. Farinacci about his hospital privileges and then subsequently denied appellants' motion to voir dire or recall Dr. Farinacci, appellants proffered a series of questions and anticipated responses. Specifically, appellants wanted to ask Dr. Farinacci (1)

whether his privileges to deliver babies had ever been suspended, revoked, or limited in any way or due to care rendered to a patient during labor and delivery; (2) "Is the reason your privileges to deliver babies at Hillcrest Hospital were suspended, revoked, or limited in any way due to the care you rendered during the labor and deliver [of L.N.]?"; and (3) "Is the reason you are not currently permitted to deliver babies at Hillcrest Hospital in any way related to the care you rendered in the labor and delivery of [L.N.]?" Appellants anticipated that Dr. Farinacci's answers would be "yes" to these questions.

{¶ 42} We find that these questions would have encouraged the jury to draw an improper inference, i.e., because Dr. Farinacci's hospital privileges to deliver babies at Hillcrest Hospital were suspended or revoked due to the care rendered during the labor and delivery of L.N., Dr. Farinacci must have breached his standard of care and acted negligently in his delivery of L.N. We find that this questioning would have usurped the role of the factfinder and thus would have been unfairly prejudicial. The jury's decision must be based on evidence presented at trial, including expert testimony, not the alleged loss of privileges.

{¶ 43} In general, a cause of action for medical negligence requires proof of (1) a duty requiring the defendant to conform to a certain standard of conduct, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) damages. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 23.

"Proof of malpractice, in effect, requires two evidentiary steps: evidence as to the recognized standard of the medical community in the particular kind of case, and a showing that the physician in question negligently departed from this standard in his treatment of plaintiff."

*Bruni v. Tatsumi*, 46 Ohio St.2d 127, 131, 346 N.E.2d 673 (1976), quoting *Davis v. Virginian R. Co.*, 361 U.S. 354, 357, 80 S.Ct. 387, 4 L.Ed.2d 366 (1960). Proof of the recognized standards and negligent departure from those standards "must necessarily be provided through expert testimony." *Bruni* at 131-132.

{¶ 44} Based on the record and the proffered questions, we find that the trial court did not abuse its discretion in denying appellants' request to question Dr. Farinacci as to whether and under what circumstances his hospital privileges had been revoked or suspended after the labor and delivery of L.N.

{¶ 45} Even if the trial court's decision was in error, appellants must establish prejudice to warrant reversal and a new trial. "An improper evidentiary ruling constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice." *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 35. In determining whether substantial justice has been done, a reviewing court must weigh the prejudicial effect of the errors and determine whether the trier of fact would have reached the same conclusion had the errors not occurred. *O'Brien v. Angly*, 63 Ohio St.2d 159, 164-165, 407 N.E.2d 490 (1980). Without an outcome-determinative effect, the error is harmless. Civ.R. 61. Appellants have failed to demonstrate prejudice such that the outcome of trial would have been different.

{¶ 46} The jury heard testimony from the treating nurses who were present at L.N.'s labor and delivery, and Dr. Farinacci, on cross-examination. The jury considered voluminous exhibits, including operative reports, nursing notes, ultrasound results, fetal stripes, and the autopsy report.

{¶ 47} An ultrasound of L.N.'s brain taken at approximately six hours after birth showed ischemia and stroke that were opined to be between one day and ten days old, i.e., occurring prebirth. The report generated from L.N.'s autopsy showed chronic abnormalities in multiple organs, including the heart, pancreas, liver, adrenal glands, kidneys, and ureter. The report further revealed that both mother and baby had been suffering from infection for several days — "cause of profound acidosis and neonatal demise is difficult to ascertain in this case." The placental pathology report revealed abnormalities in the placenta stemming from implantation, which is in the beginning of pregnancy.

{¶ 48} L.N.'s death certificate stated that the cause of death was multiple organ and system failure, due to multiple hypoxic ischemic encephalopathy, severe metabolic acidosis, and disseminated intravascular coagulation. The certificate noted other significant contributing conditions, including neonatal respiratory failure and neonatal cardiac failure.

{¶ 49} The jury also heard competing expert testimony by appellants' experts, Dr. Sarah Mulkey, a pediatric neurologist with a specialty in fetal and neonatal neurology; Dr. Carol Benson, radiologist and specialist in neonatal ultrasonography; Dr. Mehmet Halit Pinar, a perinatal pediatric pathologist; and Dr.

Robert Dein, an expert in obstetrics and gynecology (appellants' standard of care expert); and appellees' expert, Dr. Bob Debbs, a high risk pregnancy specialist who specializes in maternal fetal medicine. Both Drs. Pinar and Debbs agreed that L.N. did not pass away due to a delay in delivery but due to chronic problems with the placenta that began at implantation and chronic abnormalities in L.N.'s organs that were months old. It is undisputed that Dr. Farinacci did not begin treating Ms. Neugebauer until she was six months pregnant; accordingly, these conditions were present before Dr. Farinacci's care and L.N.'s delivery.

{¶ 50} To find prejudicial error, appellants would have to demonstrate that the jury discounted the medical evidence and expert testimony and rendered a defense verdict simply because Dr. Farinacci testified that he did not breach the standard of care in his treatment during the labor and delivery of L.N. It is reasonable to conclude that a jury could view a defendant-physician testifying on his behalf as self-serving.

{¶ 51} Moreover, the jury was presented with admissible information that could question Dr. Farinacci's credibility. The trial court permitted appellants to ask Dr. Farinacci about his current practice, including that he stopped delivering babies shortly after L.N.'s birth. Additionally, the court permitted appellants to ask appellees' expert, Dr. Debbs, about Dr. Farinacci's responses in his deposition about whether he had his privileges terminated or suspended and that he did not provide an answer. Dr. Debbs agreed that obstetricians can have their delivery privileges suspended or restricted by a hospital.

**{¶ 52}** In fact, during closing argument, appellants directed the jury to this testimony when focusing on the fact that appellees did not call Dr. Farinacci to testify despite appellees stating during their opening statement that he would testify and that he was a top expert in obstetrics.

> Dr. Farinacci, he never told you his side of the story. * * * You can use it against him and you should use it against him. We heard how sorry he is, we heard how he's so devastated, he did such a great job, he's such a great doctor.
>
> You heard in opening statement how you're going to hear — you heard that you are going to hear that he is actually one of the top experts in his field. That's what defense counsel told you in opening statement. She told you she would do that.
>
> Did they stick him on the stand? Did he choose to get up there and tell you any of his story? No, he didn't. He let old Dr. Debbs take care of it for him.
>
> But what did — we did learn a little bit because we are allowed to call him and we called him and we talked to him. One thing we do know about him is he stopped delivering babies just a few months after this happened. He told you, I don't do it anymore. I still have my office practice but I don't deliver babies anymore.
>
> And then he didn't take the stand, didn't explain any of that to you, so we got to talk to Dr. Debbs. And we said, Dr. Debbs, do you remember reading Dr. Farinacci's deposition where he said he's never been terminated, but then I asked him if he's ever been suspended or revoked and he didn't answer?
>
> * * *
>
> And he didn't answer. He never got up and explained that to you. He chose not to take the stand and tell you anything. What does that tell you about him and what he believes and how confident he is in his care? If he was that confident that he didn't breach the standard of care, why didn't he sit on that stand and tell it to you?

(Tr. 1008-1010.) Although appellants were never permitted to ask Dr. Farinacci directly about his hospital privileges, appellants created enough speculation where a reasonable jury could infer that L.N.'s delivery and death could have impacted Dr. Farinacci's decision, whether voluntary or involuntarily, to stop delivering babies.

{¶ 53} Accordingly, the trial court did not abuse its discretion in denying appellants from presenting testimony regarding Dr. Farinacci's hospital privileges. Even if the court's decision was in error, appellants have failed to demonstrate that but for the error, the outcome of the trial would have been different. Appellants' second assignment of error is overruled.

## B. Impeachment of Dr. Farinacci

{¶ 54} In their first assignment of error, appellants contend that the trial court committed an abuse of discretion and violated their fundamental due process rights to a full and fair cross-examination by refusing to permit appropriate impeachment of Dr. Farinacci, who served as his own expert. Specifically, they contend that the court erred in refusing to allow any inquiry into the "true reasons" that Dr. Farinacci stopped delivering children following L.N.'s death.

{¶ 55} Evid.R. 611 sets forth the "scope of cross-examination." It provides that "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." "'Relevance, in the context of cross-examination, includes not only all facts in issue but also a witness's credibility.'" *Southworth v. N. Trust Secs.*, 8th Dist. Cuyahoga No. 99250, 2013-Ohio-2917, quoting *Fields v. Dailey*, 68 Ohio

App.3d 33, 42, 587 N.E.2d 400 (10th Dist.1990), citing Evid.R. 611(B); *McCormick*, Evidence, Section 29, at 63 (3d Ed.1984).

{¶ 56} The scope of cross-examination lies within the sound discretion of the trial court. *Renfro*, 52 Ohio St.3d at 33, 556 N.E.2d 150. The standard of review on such evidentiary rulings is whether the trial court abused its discretion. *Id.* An abuse of discretion is shown when a decision is unreasonable, that is, when there is no sound reasoning process that would support the decision. *AAA Ents. v. River Place Community*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 57} Prohibiting cross-examination upon relevant matters is improper unless legitimately "unfair" prejudice is established. "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Oberlin*, 91 Ohio St.3d at 172, 743 N.E.2d 890. Nonetheless, the scope of cross-examination is not unfettered, and counsel is not allowed to pursue a fishing expedition by way of cross-examination. *In re A. V.*, 10th Dist. Franklin No. 05AP-789, 2006-Ohio-3149, ¶ 32, citing *Helton v. Moore*, 617 F.2d 603 (6th Cir.1980).

{¶ 58} The testimony that appellants wanted to elicit from Dr. Farinacci involved whether his privileges at Hillcrest Hospital were or had been suspended or revoked following and due to the delivery of L.N. This court previously determined that this information would have been unfairly prejudicial and thus inadmissible under Evid.R. 403(B).

{¶ 59} Nevertheless, appellants contend that they should have been permitted to cross-examine Dr. Farinacci to fully explore whether he voluntarily

decided to stop delivering babies following L.N.'s death or whether he had been asked or convinced by others to give up that part of his practice as a result of the delivery that precipitated this malpractice action because this line of questioning would have impeached his credibility. They claim that Dr. Farinacci was untruthful in his deposition when he said that he voluntarily stopped delivering babies following L.N.'s death. We find that appellants have not presented any evidence or testimony to support their belief, and we do not find that the record supports that Dr. Farinacci was untruthful during deposition about the status of his privileges or license.

{¶ 60} During deposition, appellants asked Dr. Farinacci whether his privileges had ever been terminated. Dr. Farinacci responded that "[n]o, my privileges have never been terminated, and my licenses have always been in good standing." (*Id.* at 11.) Additionally, he stated that he stopped delivering babies because of a "personal decision" and due to age. Thereafter, Dr. Farinacci's counsel instructed him not to answer any further questions about his hospital privileges, including suspensions and revocations. Although appellants believed that Dr. Farinacci's deposition testimony was untrue, mere speculation does not render this belief sufficient to allow impeachment evidence. *See* Evid.R. 607(B) ("A questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact.").

{¶ 61} Appellants rely on *Oberlin*, 91 Ohio St.3d 169, 743 N.E.2d 890, as instructive. In *Oberlin*, the plaintiff wanted to impeach the defendant-physician's

expert with evidence that the expert was a named defendant in his own pending malpractice action alleging a similar medical error. The Ohio Supreme Court permitted this impeachment evidence because the information was probative and admissible pursuant to Evid.R. 616(A) to prove the expert's bias, prejudice, or motive to misrepresent. *Id.* at 171. The *Oberlin* Court noted that by permitting this impeachment testimony, "there was no * * * danger of an evidentiary ricochet * * * because [the defendant's expert] would have only been testifying only about his own malpractice case. The evidence would have no reflection on [defendant-physician]." *Id.* at 172. Accordingly, the court noted that the defendant-physician would not be unfairly prejudiced by the impeachment of his own expert witness. We find *Oberlin* distinguishable. In this case, Dr. Farinacci was the party sought to be impeached — not his expert — and as previously determined, the line of questioning would have been unfairly prejudicial.

{¶ 62} Appellants also ask this court to follow Indiana case law that concluded that peer review privilege does not extend to the final action (modification, restriction, termination of privileges), and is thus discoverable and admissible in judicial proceedings. In *Fridono v. Chuman*, 747 N.E.2d 610 (Ind.App.2001), the trial court permitted the defense to cross-examine the plaintiff's expert witness with a document revealing that his staff privileges were restricted or modified following a peer review process. In permitting this testimony, the court construed two conflicting Indiana laws — one that provides for disclosure of a final action taken by a hospital and another that prohibited the discovery or admission of

the determinations of peer review committees in judicial proceedings absent a waiver. *See* Ind.Code 34-30-15-1 and 34-30-15-9. In resolving the conflict, the *Fridono* Court found that the "final action" was not protected by peer review privilege. *Id*. at 620.

{¶ 63} In *Linton v. Davis*, 887 N.E.2d 960 (Ind.App.2008), the court expanded on the holding in *Fridono*. In *Linton*, the plaintiff called the defendant-physician in her case-in-chief. During cross-examination of the physician, the plaintiff asked his opinion on the standard of care he provided to the plaintiff. He testified that he believed that he adhered to the standard of care. The *Linton* Court, relying on their statutory interpretation in *Fridono*, held that "because Dr. Linton was properly questioned as to the standard of care provided to [plaintiff], he was testifying as an expert and as such could be impeached with his licensure status." *Id*. at 969. The court stated, however, that only the final action taken by the licensing board was admissible, not any of the findings. *Id*. at 969.

{¶ 64} We decline to following the holdings in *Fridono* and *Linton*. Ohio, unlike Indiana, does not have a conflict in its laws regarding the confidentiality of peer review committee determinations. R.C. 2305.252(A) prohibits testimony "as to any finding, recommendation, evaluation, opinion, or other action of the committee or a member thereof." *See also Meade v. Mercy Health-Regional Med. Ctr., LLC*, 2019-Ohio-438, 130 N.E.3d 1058, ¶ 15 (9th Dist.) (statute protects not only the information and considerations during the peer review process, but also the

outcomes or results of the committee). Accordingly, *Fridono* and *Linton* are also distinguishable.

{¶ 65} For the foregoing reasons, we find that the trial court properly limited appellants from cross-examining Dr. Farinacci about the status of his privileges following L.N.'s delivery because such testimony would have been unfairly prejudicial. The first assignment of error is overruled.

{¶ 66} Judgment affirmed.

It is ordered that appellees recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

LISA B. FORBES, J., and
EILEEN T. GALLAGHER, J., CONCUR